226 F.2d 526
 W. O. BEDAL, Appellant,
v.
The HALLACK AND HOWARD LUMBER COMPANY, a Corporation,
Appellee; and W. O. BEDAL, Appellant, v. OREGON SHORT LINE
RAILROAD COMPANY, a Corporation, and Union Pacific Railroad
Company, a Corporation, Appellees.
 No. 14197.
 United States Court of Appeals Ninth Circuit.
 Oct. 14, 1955.
 
 Elam & Burke, Fred M. Taylor, Laurel E. Elam, Carl A. Burke, Carl P. Burke, Boise, Idaho, for appellant.
 Oscar W. Worthwine & J. Eberle, Boise, Idaho, for appellee Hallack & Howard Lumber Company.
 Bryan P. Leverich, Salt Lake City, Utah, L. H. Anderson, E. H. Casterlin, E. C. Phoenix, Pocatello, Idaho, for appellee Oregon Short Line R.R. Co. and Union P.R.R. Co.
 Before HEALY, BONE and POPE, Circuit Judges.
 POPE, Circuit Judge.
 
 
 1
 The Union Pacific Railroad Company, here called Railroad, operated a railroad line paralleling the Payette River in the State of Idaho. At a point on that line between the towns of Nampa and McCall, a sidetrack had been constructed to the west of the main line of the track. On the third day of March, 1944, the Railroad,[1] as lessor, executed to the appellee Hallack and Howard Lumber Company, as lessee, a lease of that portion of its right of way paralleling the sidetrack mentioned extending a distance of approximately 550 feet. The leased tract was approximately 70 feet in width. Its side nearest the sidetrack was approximately 8 1/2 feet from the center of the track and the side most distant from the track, some 70 feet to the west, coincided with the westerly boundary of the Railroad's right of way. This parcel of land was known as Banks Landing and it was leased for the sole purpose of serving as a log loading site. For a distance of some 15 or 20 feet back from the tracks the leased ground was level but from that point on toward the west there was a steep slope upward extending some 47 feet on an angle to a place where the ground again levelled off at this higher level which was some 18 feet higher than the top of railroad below. A truck or wagon roadway ran along the westerly edge of these leased premises and at the very edge of the slope.
 
 
 2
 On March 31, 1945, the lumber company entered into a contract with the appellant Bedal and one Smith, whereby Bedal and Smith agreed to cut and skid certain timber belonging to the lumber company and to haul and deliver the same at the Banks Landing and load it on the railroad cars there. For this Bedal and Smith were to be paid a stated sum per thousand feet. The contract provided that the logging operations should be under the direction of the lumber company, but it was stipulated that Bedal and Smith were to be independent contractors and the lumber company was not to be liable for any claims whatsoever which might be incurred by them.[2] This logging contract was amended from time to time in several particulars not material here except that prior to the time of the occurrences here described it had been amended to provide that the appellant Bedal should be substituted for and in the place of himself and Smith as the contracting party under this logging contract.
 
 
 3
 Following the execution of the logging contract, Bedal and Smith proceeded to deliver logs at the landing. The logs were moved in by trucks which stopped on the road at top of the slope. By means of a hoist the logs were rolled off the truck and down the slope. Between the foot of the slope and the track the contractors constructed a bunker made of logs forming a barricade six to eight feet high. As the logs rolled down the slope they would roll against and hit these bunker logs.[3]
 
 
 4
 By September 15, 1949, Bedal had been substituted for Bedal and Smith as second party under the logging contract and was then in the process of delivering logs at the Banks Landing.[4] The Railroad employed a car inspector, one Powell, who inspected the railroad cars after they had been loaded with logs. On the morning of the day mentioned, Powell had stepped from the top of an empty railroad car which was about to be loaded to the top of the bunker and then walked a distance of 60 to 80 feet away from the railroad car in order to be in a safe place as Bedal's truck on the road above was about to be unloaded and the logs rolled towards the empty car below. He was sitting on a bunker log at this position with four other men standing or sitting nearby when a slab broke from one of the rolling logs, flew through the air, and struck and injured Powell.
 
 
 5
 Powell sued the Railroad for damages under the Federal Employers' Liability Act, Title 45 U.S.C.A. § 51 et seq., alleging, among other things, that the defendant Railroad had negligently required him to work at the place where he was injured. The Railroad gave notice to the lumber company of the commencement of the action and the nature thereof. It called attention to the terms of the lumber company's lease from the Railroad and stated that it expected to be reimbursed for any judgment that Powell might recover against it, and tendered to the lumber company the defense of the action requesting that it undertake such defense. The lumber company refused to take over such defense. The Railroad sent no communication to Bedal and made no demand upon him.
 
 
 6
 The action by Powell was commenced on October 13, 1950; the answer was filed October 24, 1950; the trial, before a jury, was begun February 26, 1951, and on March 2, 1951, the jury returned a verdict for Powell in the sum of $15,000. On January 10, 1951, some 47 days before the trial, a representative of the lumber company wrote to Bedal enclosing a copy of Powell's complaint against the Railroad stating that the lumber company had been advised by the Railroad that the latter would hold the lumber company liable under the terms of its lease agreement. It referred to the logging contract between the lumber company and Bedal and Smith, and the provisions therein that Bedal's trucks and drivers were to be covered by insurance and take care of public liability, the policies to name and protect the lumber company. It stated, 'We understand that you did carry liability insurance as called for by the logging contract. This letter is to advise you that the Hallack and Howard Lumber Company will look to you and your insurance carrier to hold harmless the Hallack and Howard Lumber Company from any liability whatsoever in this matter. We will appreciate it if you will advise us as to the liability insurance carried by you, the amount and the name of the insurance carrier.' Nothing in the letter referred to the Railroad's request that the lumber company assume the defense of the action, and there was no express request that Bedal presently take any steps other than to give the lumber company the information requested.
 
 
 7
 Following the return of the verdict in favor of Powell, the Railroad settled the judgment thereon by payment of $14,500. The Railroad then brought the present action against the lumber company. It set up the lease of March 3, 1944, above referred to, and alleged that the lease provided that the lumber company would hold the Railroad harmless from any and all damages or judgments in any manner accruing by reason of the use of the premises by the lessee; that the lessee would protect the lessor from all injury, damage or loss by reason of the occupation of the premises, or from any cause whatsoever accruing out of the lessee's use thereof; that while the agreement was in full force and effect, and while the defendant, its agent, servants and employees were unloading logs on said premises, a piece of timber broke off one of the logs and struck Powell who filed his action and recovered judgment which the Railroad had been obliged to compromise, as indicated above; that the accident and resultant injuries were caused by the use and occupation of the leased premises and by the unloading of the logs by the lumber company, its agents, servants and employees, and accordingly it became the duty of the lumber company to assume and pay for all injuries and damages sustained by Powell and to indemnify the Railroad. The lumber company first tendered defense of this action to Bedal, demanding that he defend it, and then moved the court for leave to make Bedal, a citizen of Idaho,[5] a party to the action. The motion was granted and a third party complaint filed and served upon Bedal. The prayer was that judgment be entered against Bedal, as third party defendant, for any and all judgments which might be entered against the lumber company under the Railroad's complaint. It was alleged that if the Railroad should recover a judgment against the lumber company defendant and third party plaintiff, it would be entitled to a judgment against Bedal, third party defendant, in like amount.
 
 
 8
 The third party complaint, in a first count, set up and alleged the terms and conditions of the logging contract between the logging company and Bedal; that Bedal was an independent contractor having charge and control of the premises which had been leased by the Railroad to the lumber company; that on September 15, 1949, while the logging contract was in effect and Bedal was acting as an independent contractor and was unloading logs at the Banks Landing, a piece of timber broke from one of the logs and struck Powell causing his injuries; that as a result of that accident the judgment was obtained by Powell against the Railroad; that after the Railroad had brought this action against the defendant lumber company, the latter had tendered the defense of the action to Bedal who had refused to take it; that after the Powell action had been instituted, the lumber company had notified Bedal thereof and advised him that the lumber company would look to him for indemnity.[6]
 
 
 9
 In a second count the third party complaint alleged that Bedal is or may be liable to the lumber company 'by way of subrogation and upon an implied contract'; that Bedal as an independent contractor under the logging contract had exclusive charge and control of the log loading bunker; that he negligently permitted the bunker to become so filled with bark, limbs and debris that it would not properly stop logs rolled down the incline; that Bedal negligently failed to remove from the log the splinter which injured Powell; that Bedal's method of unloading logs was dangerous to life and limb; that as a result of the negligence of Bedal in so maintaining the log bunker and unloading logs Powell was seriously injured resulting in the judgment which Powell recovered.
 
 
 10
 The case of the Railroad against the lumber company, and the case of the lumber company against Bedal were tried together and evidence in both received simultaneously, although the case of the Railroad against the lumber company was tried without a jury and that of the lumber company against Bedal was tried before a jury. On behalf of plaintiff Railroad there was admitted in evidence the records in the case of Powell against the Railroad, unanswered requests for admissions addressed to the lumber company, certain admissions of the third party defendant, Bedal, maps showing the location of the leased area, testimony as to how the logs were unloaded from the truck, and portions of Powell's testimony at the earlier trial against the Railroad. There was also read in the record, pursuant to stipulation that it might be considered by the court and jury in the same manner as if the witnesses were present and testifying, the testimony of certain other witnesses given at the trial of the Powell action. Upon this record the cause was submitted.
 
 
 11
 In the trial of its action against Bedal, the third party plaintiff offered in evidence the record in the Powell case for the purpose of showing the scope of what was adjudicated there. (It was admitted for that purpose only.) An additional witness was called on behalf of the lumber company who identified the logging contract of Bedal and testified that Bedal alone and not the lumber company carried on the logging operations and the unloading at the landing. All parties then rested, and the court, denying the motion of Bedal for a directed verdict in his behalf, granted the lumber company's motion for a directed verdict in favor of the lumber company and against Bedal in the sum of $18,334.15, the amount which the court by its own findings determined to be the amount due the Railroad from the lumber company. On September 22, 1953, the court rendered judgment against the lumber company and in favor of the Railroad based on its findings and conclusions of that day. The directed verdict against Bedal was returned the next day and judgment entered thereon on that day. Bedal has appealed from both judgments.
 
 
 12
 In thus directing a verdict in favor of the lumber company and against Bedal, it is apparent that the court below was of the opinion that upon the showing made at the trial Bedal was required as a matter of law to indemnify the lumber company to the extent and in the amount of the Railroad's recovery against it.[7] It will be recalled that the lumber company's third party complaint against Bedal undertook to state a claim in two counts. The first count contained allegations to the effect that the logging contract between the lumber company and Bedal contained provisions and clauses which required Bedal to indemnify the lumber company against this recovery which the Union Pacific was allowed. This was a count based on written contract. It contained no allegations of negligence on the part of Bedal. The second count, on the contrary, alleged that in certain respects specified, Bedal was guilty of negligence in unloading the logs; that this negligence caused the injuries to Powell and hence that the lumber company was entitled to a judgment against Bedal 'by way of subrogation and upon an implied contract'. The theory apparently was that because of the alleged negligence of Bedal there arose an obligation upon his part to indemnify the lumber company.
 
 
 13
 A statement made by the court at the time the directed verdict against Bedal was granted, would indicate that the court accepted the theories of both counts. The court placed particular emphasis upon a provision of the logging contract which required Bedal to procure public liability insurance covering his trucks and drivers, the policies to name and protect the lumber company. The court referred to this as an 'outstanding' provision of the contract. The court also said: 'In addition to the contract itself, under the rule of equity, if the third party Defendant W. O. Bedal, was negligent in the unloading of the logs which caused the injury to said Powell * * * an implied contract of indemnity also arises in favor of the Hallack and Howard Lumber Company as it has been exposed to this litigation and compelled to pay damages on account of the negligence of Bedal'. Apparently, in answer to a contention that the question of whether Bedal was or was not negligent should be left to the decision of the jury, the court said: 'The only innocent party that there is to this lawsuit is the Hallack & Howard Lumber Company, and they are the ones who were responsible to the Railroad Company and the Railroad Company was liable and the jury in the case that was tried heretofore found that this was an act of negligence and brought in a verdict against the Union Pacific Railroad Company. Should W. O. Bedal after all these proceedings be allowed to gamble on another jury's verdict which may be different from the jury's verdict already returned in this Court. The first jury found that it was negligence to drop these logs off and let them roll down this hill unrestrained as they were, which caused the slab to break off, which injured Powell. It would be a mockery on justice to say that W. O. Bedal, who rolled that log off and caused this injury could come back here and gamble with another jury, and sit idly by and let Hallack & Howard become liable for his acts, and then say that there must be another adjudication.'
 
 
 14
 It is difficult to see how the clauses of the logging contract relied upon by the lumber company can be said to require Bedal to indemnify the lumber company for a judgment which was based upon the express provisions of the lumber company's own lease. The first of these clauses reads as follows: 'It is further stipulated and agreed that under no circumstances or conditions is the party of the first part to become liable for any claims whatsoever which may be incurred by the parties of the second part or any of their agents, servants or employees in carrying out this contract, and under no circumstances shall this agreement be considered as a partnership agreement, nor shall the parties of the second part be considered by this contract, or any interpretation thereof, to be the agents of the first party, and it is understood and agreed that this is what is commonly termed and called an independent contractor's agreement.' The other clause states: 'Second parties further agree that all trucks and drivers are to be covered by insurance to take care of public liability and property damage, said insurance to specifically name and protect said first party in case of possible accident involving persons or property not connected with or owned by the parties to this contract. Second parties further agree that the use of their trucks on the public roads shall be in strict compliance with the state regulations governing such use, and will at their own expense provide each truck with all equipment for safe operation and comply with all the rules and regulations of the United States and the State of Idaho, and any and all rules and regulations promulgated by said United States or the State of Idaho or any bureau or agency thereof.'
 
 
 15
 We note nothing in these paragraphs, or in any other part of the logging contract of Bedal, which would sustain the judgment against him. The first of the paragraphs is plainly designed to make it clear that Bedal was an independent contractor and neither an agent nor a partner. The stipulation is clearly negative in content so far as the lumber company is concerned. The lumber company is not to be liable for any claims incurred by Bedal. Wholly absent is any suggestion whatever that Bedal should be liable for any claims against or incurred by the lumber company. The Railroad's judgment against the lumber company is predicated upon promises made by the lumber company to the Railroad in a lease between those parties. There is no suggestion that Bedal agrees to assume any responsibility or obligation under or stated in that lease. Indeed, the logging contract makes no reference or allusion to such a lease or to any lease and it is not apparent that Bedal had even heard of it when he executed the logging contract.
 
 
 16
 The second paragraph relied on as creating an express obligation on the part of Bedal to provide indemnity for the Railroad judgment against the lumber company is likewise wanting in any provision to that effect. Clearly enough it covers the one subject of procuring of insurance against public liability and property damage on all trucks and drivers of Bedal. It provides that the lumber company is to be named and protected under those policies.
 
 
 17
 This language cannot be read as a provision for an agreement of indemnity of the character asserted by the lumber company.[8] The theory upon which the court entered judgment against the lumber company appears to have been that the latter's lease obligated it to indemnify the Railroad not merely against the lumber company's negligence but against the Railroad's own negligence. It is not perceived that the negligence of the Railroad which gave rise to Powell's recovery was negligence in the operation of a truck but that question is not present here.
 
 
 18
 We conclude that the judgment against Bedal cannot be sustained upon the theory that the logging contract required him to indemnify the lumber company.
 
 
 19
 We next consider the other ground urged in support of the court's judgment that an obligation of implied indemnity arose out of the circumstances under which Bedal carried on his operations.
 
 
 20
 In the case of Booth-Kelly Lumber Co. v. Southern Pacific Co., 9 Cir., 183 F.2d 902, 20 A.L.R.2d 695, this court had occasion to consider at some length the rules commonly applied in such cases. That was an action brought to procure indemnity but it was based upon the provisions of a written contract. We found it necessary to examine the common law rules relating to indemnity, particularly as applied to the effort of one wrongdoer against whom judgment has been granted to procure recovery from the other wrongdoer. After citing a number of cases which we believed illustrated the rules commonly applied, we noted that ordinarily one wrongdoer cannot recover against another contribution or indemnity for damages suffered in consequence of their joint wrongs; that there were cases which fell into 'an exceptional class', and that this exception was summarized and restated in § of the Restatement of the Law of Restitution.[9]
 
 
 21
 An examination of § 95[10] will disclose that before its terms may be made to apply to Bedal, it must appear first that the harm to Powell came about in part because of Bedal's negligence; second, that the dangerous condition which caused Powell's harm was one created by Bedal's misconduct, or the situation must have been such that as between Bedal and the Railroad it was Bedal's duty to make the place safe; and third, that the Railroad did not acquiesce in the condition of danger after discovery thereof.
 
 
 22
 As a matter of course these would be questions for the jury to determine. However, in declining to submit these or any questions to the jury, the court held that all the necessary determinations with respect to Bedal's negligence and misconduct had been made in the case of Powell against the Railroad and were now concluded by that judgment not merely as against the parties to the action but as against Bedal as well. In so deciding we are of the opinion that the trial court was in error. The reason is suggested by what we said in the Booth-Kelly case, supra. There the Southern Pacific had also been held liable to its employee because of its negligence in failing to furnish him a safe place to work. It then sought indemnity from Booth-Kelly on the ground that Booth-Kelly's negligence in leaving a wood cart too close to the Southern Pacific sidetracks made the place of work dangerous. Judgment for the Southern Pacific was based upon the trial court's finding that Booth-Kelly's negligence was primary, active and direct, while the negligence of the Southern Pacific was passive and remote. In that case also, when the Southern Pacific was sued, it gave notice to Booth-Kelly and an opportunity to defend. In meeting the argument of Booth-Kelly that the judgment in favor of the injured railroad employee had determined and adjudicated the issues in dispute between the railroad and Booth-Kelly, this court said, 183 F.2d at page 912: 'It is next argued that it was not permitted to the court to find that Booth-Kelly's negligence was 'the active, direct, proximate and primary cause of the injury', for the reason that the judgment in the Powers case, which, because of the notice and opportunity to defend, was admittedly binding on both of the instant parties, had determined that the negligence of the Southern Pacific constituted the immediate proximate cause of the accident, and had determined that Booth-Kelly's negligence, if any, was a mere remote cause, and that such is now res judicata.
 
 
 23
 'The trial court rejected this contention and in this we think it was right. As the Oregon court said in the (City of) Astoria (v. Astoria & C.R.R. Co.) case, supra (67 Or. 538, 136 P. 645, 49 L.R.A.,N.S., 404), 'The scope of the estoppel created by the judgment in the primary case embraces all of the issues determined by it.' But that determination here was simply that Powers received injuries to the extent of his judgment, and that a contributing proximate cause of these injuries was the negligent failure of Southern Pacific to furnish him a safe place to work by failing to warn him of the presence of the wood cart. But which act of negligence was primary, or which active or direct, was not an issue in the Powers case.'
 
 
 24
 What was said there is equally applicable here. As stated in the court's findings quoted above (note 8), the railroad 'was held liable for the injuries sustained by the said A. M. Powell, only because it had not furnished Powell a safe place within which to perform his work.'[11] Here, as in the Booth-Kelly case, the determination in the railroad employee's case was simply that the employee, (here Powell) sustained injuries; that a contributing proximate cause of these injuries was the negligent failure of the railroad to furnish him a safe place to work. But whether the place where he worked was unsafe merely because it was in proximity to logging operations which, like all logging operations, are inherently hazardous, or whether they were dangerous because of some negligence on the part of Bedal, or whether the happening was an unavoidable accident, was not a matter at issue or decided in that case.[12]
 
 
 25
 The judgment in the Booth-Kelly case enforcing an obligation of indemnity was based upon a finding, see 183 F.2d at page 910, that Booth-Kelly's negligence was the active, direct, proximate and primary cause of the injury to the railroad's employee. With respect to the railroad's negligence, the court's finding was merely that 'some element of negligence on the part of plaintiff concurred to cause the action'. These new findings we there held the court might appropriately make in the suit between the indemnitor and indemnitee notwithstanding the railroad employee had recovered a judgment against the railroad in the prior suit which Booth-Kelly had been requested to defend. These findings we there pointed out were necessary to make a case of the kind mentioned in Restatement of the Law of Restitution, § 95, supra. It was noted that the mere fact that Booth-Kelly had been negligent would not be enough to establish grounds for recovery, since the ordinary rule is as stated in § 102 of the same Restatement as follows: ' § 102. Concurrent and Joint Negligence. Where two persons acting independently or jointly, have negligently injured a third person or his property for which injury both became liable in tort to the third person, one of them who has made expenditures in the discharge of their liability is not entitled to contribution from the other.'
 
 
 26
 It is plain that no issue was present in the action by Powell against the Railroad which would call for a determination negativing the possibility that if Bedal was negligent and the Railroad was negligent, both were simply joint tortfeasors within the meaning of the language stated in § 102.[13] Thus, even if it were assumed that the adjudication in Powell's action involved a determination that Bedal had been negligent, and if it be assumed that Bedal was bound by that adjudication, the question still remained undetermined whether the Railroad and Bedal were within the rule of § 102 or within the rule of § 95.
 
 
 27
 Bedal argues further that he is not bound even by the limited findings in the Powell suit, for the reason that he was never requested to defend that action, and was never tendered the defense. Hence, says Bedal, it was still open to him to litigate the question whether Powell was entitled to recover in the first place. He relies upon the rule that the indemnitor may be bound by a judgment against the indemnitee only 'if the indemnitee gave the indemnitor reasonable notice of the action, and requested him to defend it or to participate in the defense', citing Restatement, Law of Judgments, § 107. The reason for that rule is stated in the comment under that section as follows: 'In order for the rule stated in Clause (a) to operate, the person entitled to indemnity must give adequate notice of the action to the indemnitor and request that he should defend it or participate in the defense. This notice must be given so that the indemnitor will have a reasonable time in which to make his defense.'
 
 
 28
 We have noted above the contents of the Lumber company's letter to Bedal, dated January 10, 1951, and its failure expressly to demand defense of the Powell action. The fact that the lumber company itself declined to participate, though requested to do so, adds somewhat to the uncertainty of the meaning of the notice contained in that letter.[14] The comment under § 107, Restatement, Law of Judgments, above mentioned, further says of the required notification of the indemnitor: 'Where the relation between the indemnitee and the indemnitor is such that it is clear that indemnity would necessarily result from the payment of the claim by the indemnitee, a request to defend and a tender of control can normally be inferred upon a seasonable notification of the pendency of the action, since such notification would obviously be only for the purpose of inviting in the indemnitor.'
 
 
 29
 Here, of course, as we have indicated, what the relation was between Bedal and the Railroad is yet to be determined. But if, upon such determination it is decided, that a duty of indemnity must be implied from the circumstances, then it would be clear that payment of Powell's judgment by the Railroad would result in the requirement that Bedal pay indemnity. In the absence of evidence upon the point in the record as previously made, it cannot be said that 47 days before trial was less than a reasonable time,[15] and we think that Bedal could fairly understand that the notice he received was to give him the opportunity to offer to participate in the defense.[16]
 
 
 30
 It was error for the court to direct a verdict against Bedal for even upon our assumption that Bedal became bound by the judgment in the case of Powell against the Railroad, yet before it could be said that Bedal was obliged to indemnify either the Railroad or the lumber company, there would have to be a determination of the following questions:--
 
 
 31
 1. Whether Bedal was negligent.-- This was not an issue in or decided in the Powell suit.
 
 
 32
 2. If Bedal was negligent, whether his negligence was 'the active, direct, proximate and primary cause of the injury' as opposed to the Railroad's passive negligence, or whether as between the Railroad and Bedal they were joint tortfeasors within the meaning of the rule of which Restatement of Restitution, § 102, supra, is a fair statement.
 
 
 33
 3. Whether, if it be found that Bedal otherwise came within the provisions of § 95 of such Restatement, he was excused from liability by reason of facts bringing the case within the final qualification of § 95 in that 'after discovery of the danger, (the Railroad) acquiesced in the continuation of the condition.' The evidence indicates that the same system of unloading logs had continued from 1945 to the date of the accident, September 15, 1949.
 
 
 34
 This brings us to the question whether because of the erroneous direction of a verdict against Bedal we should not only reverse the judgment against him but remand the cause for a new trial. Bedal has specified as error the action of the court in denying his motion for a directed verdict in his own behalf. We now proceed to inquire whether that motion should have been granted. If not, a new trial is in order.
 
 
 35
 The evidence before the court below included the entire record in the case of Powell against the Railroad (offered and received for the purpose of showing the issues in that case), and certain admissions on the part of Bedal made in response to requests therefor, in which it was admitted that Powell's injuries were caused by a piece of timber which broke off one of the logs being unloaded at the Banks Landing; that Bedal was unloading the logs for the use and benefit of the lumber company pursuant to his logging contract with that company, and that the lumber company was the owner of the logs and paid Bedal for hauling and unloading. The bulk of the testimony was by stipulation presented by reading from the transcript of evidence in the Powell case the testimony of four witnesses who were present at the time of the accident and who were sitting or standing beside Powell shortly before the slab struck him. Hansen was employed by Bedal as a loader. He operated the loading device which took the logs from the bunker and loaded them on board cars. Ritter and Parrish were 'hookers' who aided in the loading operation by fastening the cables to each end of the logs as they were loaded on the cars. Sage scaled the logs for the lumber company after they were loaded on board the cars. These men described the method of stopping the trucks on the road at the head of the slope so that the logs from each load would roll down opposite the car to be loaded. All agreed that the bunkers along the sidetrack and some four feet distant therefrom had been constructed of large logs, and were three logs in height extending some two feet above the level of the floor of the cars. It appeared from their testimony that at the time in question the space behind the bunkers and opposite the cars had become largely filled with bark, debris and dirt as a result of the rolling of the logs down the hill and against the bunkers; and that occasionally because of this filling a log would roll over the top of the bunker on or against the cars. Occasionally this debris would be cleaned out but at the time of the accident the space behind the bunkers had been allowed to remain filled for a week or more. Sage had been working there in connection with this operation since 1945; Hansen, since the preceding May; Ritter for some four years, and Parrish since the preceding July. All stated that while often bark would fly from the logs as they rolled down the hill, none had ever seen a slab or piece of wood become detached or fall off in this manner prior to the accident to Powell. It developed in the testimony of Ritter that the logs were unloaded by pushing them off in a series; it usually required three pushes to unload a truck. When the logs fell they would fall about 12 feet before striking the ground and then roll on down the slope. All four men with Powell had moved some 60 to 80 feet north from the car to be loaded and were watching the operation. Ritter saw the slab when it broke off from a rolling log and saw it start to fly through the air in the direction of the place where the men were sitting or standing. He testified, 'A. I saw the slab coming through the air. Q. Did you see where it broke off, where the logs were, that this slab broke off of? A. About one-half way down the hill I would say.' Powell did not see the slab until just before it struck him. Hansen did not see it until it struck Powell. Parrish did not see the piece break off the log but saw it in the air flying toward them and coming from the west. He thought it was 10 or 12 feet from the rolling logs when he saw it. Sage did not see the slab break off the log but he too saw it coming through the air, which he said was from the west and the south; the logs he said were about halfway down the hill when he saw the slab coming through the air. These witnesses described the slab as being 4 or 5 feet long, consisting mainly of wood and weighing about 80 pounds. It was testified that the unloading of this truckload of logs was handled in the same way in which logs had been unloaded on prior occasions. Portions of Powell's testimony at the former trial were read into the record but they added nothing to the description given by these witnesses of what happened on that occasion. In addition to the testimony read from the former record, the Railroad's assistant engineer identified a map of the area leased by the Railroad to the lumber company and described the topography of the leased ground. An employee of Bedal was called who testified as to the mode of unloading the logs through the operation of a boom attached to a tractor and he indicated on the map where the truck was standing when the logs were unloaded. He testified, as did another witness called by the lumber company, that the operation was that of Bedal and not that of the lumber company.
 
 
 36
 It is plain that the accumulation of the bark and other debris behind the bunkers had nothing to do with the flying off of the slab. The one witness who saw the slab leave the log testified positively that this was at a point halfway down the hill; another witness who saw the slab fly toward him described it as coming from the west, and another said from the west and south. At the time of the accident these witnesses were located due north of the car to be loaded, and it is obvious that it would have been a physical impossibility under these circumstances for this slab to have become detached through striking the railroad car. There is no evidence whatever as to any prior discoverable defect in any of the logs. A splitting of such a slab from a log had never happened before.
 
 
 37
 The only fact that was proven was that an accident occurred and that it occurred through the slab or piece of log falling through the air. But upon the question as to what caused the slab to split off there is no evidence whatever. The evidence is that the slab left the log when the log was halfway down the hill, but whether that particular log had previously been weakened or whether the process of splitting had begun when the tree was felled or the log was skidded in the woods or whether the splitting process did not begin until the log fell from the truck the record does not show.[17] The evidence indicates that as is customary, the logs were being handled with the bark still on. There was no evidence in the record as to whether, if a log had been splintered in the woods, that fact would have been discoverable through inspection of the log.
 
 
 38
 It is axiomatic that the mere happening of an accident is not in itself proof of negligence. Nor has it ever been held that engaging in logging operations and carrying them on in the usual manner in itself constitutes negligence although such operations are necessarily hazardous in character and so designated in most workmen's compensation acts. However, the record does show that Bedal had exclusive control of the trucks, the unloading operations and the place where the logs were being unloaded; and if the accident was one which ordinarily would not happen without negligence, then the rule of res ipsa loquitur may apply, particularly when evidence of the true explanation of the accident is more accessible to the defendant than to the plaintiff. The question whether the rule of res ipsa loquitur may be applied as a reason for permitting a possible inference of negligence from the circumstances shown is a difficult one. The occasions for the application of the rule have generally been held to be those stated in Escola v. Coca Cola Bottling Co. of Fresno, 24 Cal.2d 453, 150 P.2d 436, 438, as follows: 'Res ipsa loquitur does not apply unless (1) defendant had exclusive control of the thing causing the injury and (2) the accident is of such a nature that it ordinarily would not occur in the absence of negligence by the defendant.'[18]
 
 
 39
 We have concluded that it may fairly be said here that this accident was one which ordinarily would not have occurred in the absence of some one's negligence, and therefore it would be permissible for the jury to infer or find negligence from the circumstances shown by the evidence. This means "that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict."[19]
 
 
 40
 The cause should be remanded for a new trial and for a determination by the jury under proper instructions of the issues here indicated. The third of those issues which we have listed above is the one whether, after discovery of the danger the Railroad acquiesced in the continuation of the condition. Plainly on the record previously made, if the only act of negligence consisted in the manner of dropping the logs from the top of the truck load to the sloping ground below, the Railroad was fully familiar with this procedure and must have acquiesced in it. Any liability on the part of Bedal must be predicated on some thing other than this well-known system of unloading the trucks.
 
 
 41
 In thus remanding for trial we are necessarily rejecting a further argument of the appellant to the effect that the rule relating to implied indemnity to which we have previously referred can have no application to the lumber company's action because what the lumber company is seeking is to be indemnified against the loss which it suffers because of its own voluntarily assumed contractual obligation to the railroad. The argument is in substance that this is not the type of case described in § 95, Restatement of the Law of Restitution, supra, for that section refers to a claim for indemnity on behalf of one who has himself caused harm to a third person through his own negligence. That is not the situation of the lumber company.
 
 
 42
 It is true that the facts of this case are unusually complicated in that it is not the Railroad which seeks to enforce an implied obligation of indemnity but rather the lumber company which has been required to indemnify the Railroad under the lumber company's express agreement to indemnify. The lumber company has standing to file its third party complaint because in relation to the Railroad it stands in no different situation than an insurer, and under the circumstances here the lumber company, if it be liable to the Railroad, is entitled to be subrogated to the latter's rights. This right of subrogation under which a party's right to indemnify is transferred by operation of law to an insurer, is one of general application. See United States v. Aetna Surety Co., 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171, and cases cited in 50 Am.Jur. 706, 707. Indeed the rule of implied indemnity itself which we have been here discussing is based upon the same general principles which gave rise to the doctrine of subrogation. For a good statement of the applicable principles see Fenly v. Revell, 170 Kan. 705, 228 P.2d 905.
 
 
 43
 Bedal has also appealed from the judgment in favor of the Railroad and against the lumber company. He was entitled to take such an appeal if he was bound by that judgment as indemnitor of the lumber company. Whether he was or was not must of course await the new trial which we have here directed.
 
 
 44
 The argument by Bedal with respect to the Railroad's judgment against the lumber company is that the trial court erred in holding that the provisions of the lease from the Railroad to the lumber company were such that the latter was obliged to indemnify the Railroad for the consequences of its own negligence. The determination that the lumber company was thus bound was based upon the provision of the lease reading as follows: 'It is especially covenanted and agreed * * * that the Lessee shall hold harmless the Lessor and the leased premises from any and all liens, fines, damages, penalties, forfeitures or judgments in any manner accruing by reason of the use or occupation of said premises by the Lessee; and that the Lessee shall at all times protect the Lessor and the leased premises from all injury, damage or loss by reason of the occupation of the leased premises by the Lessee, or from any cause whatsoever growing out of said Lessee's use thereof.' It would be hard to find more all-inclusive language. In view of this undertaking the lumber company was, as we have previously suggested, in a situation comparable to that of an insurer. We hold that the contention made with respect to the meaning of this language is not tenable. Therefore, upon a new trial Bedal may not then question the validity of the judgment of the Railroad against the lumber company. This judgment the lumber company has not attacked and its validity as against it is no longer open to question.
 
 
 45
 But for the reasons heretofore stated, the judgment against the appellant Bedal is reversed and the cause is remanded for a new trial, consistent with this opinion, upon the issues arising under the Third Party Complaint and the answer of the appellant thereto.
 
 
 
 [1]
 It appears that the railroad line was owned by Oregon Shortline Railroad Co. but was leased to the Union Pacific Railroad Company with operated it. The lease about to be described was executed on behalf of both companies. Unless otherwise indicated, in referring to the 'Railroad' we refer to both companies
 
 
 [2]
 We shall have occasion later to quote this and other provisions of the contract verbatim
 
 
 [3]
 It will hereafter appear that at the time of the accident here involved the bunker was full of debris, limbs and bark making it difficult for the bunker to stop the logs. Some of the logs would roll over the bunker and strike the cars
 
 
 [4]
 Bedal had been thus substituted by a contract amendment dated May 7, 1949. It does not readily appear just when Bedal and Smith began performance under their contract and delivery of logs at the Banks Landing, although an amendment of the contract dated December 14, 1945, indicates that at that time logging in the area mentioned in the original contract was approaching completion and this amendment was designed to provide for the moving of the logging camp to an area mentioned in that amendment. It thus appears that performance began sometime in 1945 and was continuing on September 15, 1949
 
 
 [5]
 The Railroad is a corporation of Utah and the lumber company is a Colorado corporation
 
 
 [6]
 This allusion is to the letter of January 10, 1951, mentioned above. The complaint alleged that Bedal had failed and refused to defend the Powell suit and had failed and refused to pay the Powell claim and had failed and refused to hold the lumber company harmless
 
 
 [7]
 The findings against the lumber company upon which the judgment for the Railroad was based, followed in general the theory of the Railroad's complaint previously described. The finding and conclusion was that the provisions in the March 3, 1944, lease to the lumber company to the effect that the lessee should hold the lessor harmless from any and all damages or judgments accruing by reason of the use or occupation of the premises by the lessee, expressly required the lumber company to indemnify the Railroad against the Powell judgment. The court found 'That the unloading of the logs onto said leased premises and the loading of said logs from said leased premises onto the cars of plaintiffs were performed solely and entirely by the defendant the Hallack and Howard Lumber Company by and through its independent contractor, the said W. O. Bedal. That the said Union Pacific Railroad Company was held liable for the injuries sustained by the said A. M. Powell only because it had not furnished Powell a safe place within which to perform his work, a duty which was nondelegable between the said Union Pacific Railroad Company and the said Powell; that the said unsafe place was created by the fault or negligence of the defendant, the Hallack and Howard Lumber Company by and through W. O. Bedal, his agent, servants or employees, and the said Union Pacific Railroad Company was guilty of no active negligence; that the active, direct, proximate and primary cause of said Powell's injuries was that of the defendant, the Hallack and Howard Lumber Company acting by and through its agent, the said W. O. Bedal, in unloading said logs in the manner and under the circumstances hereinbefore referred to.' The court's conclusion was that under the provisions of the lease agreement it was the duty of the defendant lumber company to assume and pay for all damages sustained by Powell and to indemnify the Railroad
 
 
 [8]
 In the previously mentioned letter of January 10, 1951, addressed to Bedal, the person writing on behalf of the lumber company recited that it was understood that this liability insurance was carried and Bedal was asked to advise as to the amount of the insurance and the name of the insurance carrier. This portion of the letter we have quoted above. There is nothing in the record to show any claim on the part of the lumber company that Bedal failed to carry such insurance and the present action involves no such question. It is therefore unimportant to speculate whether the writer of that letter was right or wrong in assuming that if such insurance existed it would require the insurance carrier to defend the Railroad action against the lumber company. That there may have been such insurance is suggested by the wording of the lumber company's demand that Bedal defend the present action by the Railroad. The letter making the demand was addressed to Bedal and 'Truck Insurance Exchange' which, the letter said, the lumber company had been advised had issued the required policy
 
 
 [9]
 Both parties quote extensively from Booth-Kelly Lumber Co. v. Southern Pacific Co., supra, and rely upon it. Our decision in that case was based in part upon Washington Gas Light Co. v. District of Columbia, 161 U.S. 316, 16 S.Ct. 564, 40 L.Ed. 712. The case of Baillie v. City of Wallace, 24 Idaho 706, 135 P. 850, is cited as in accord with the Washington Gas Light case. It does contain a statement seemingly in accord as to liability of a third person responsible for a street defect, but the Idaho case did not involve the question of liability of a third person to the City, as the City was the sole defendant
 
 
 [10]
 This section is headed 'Personal Responsibility for a Dangerous Condition' and is as follows: 'Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other, or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition.'
 
 
 [11]
 The jury in the case of Powell v. the Railroad was instructed as follows: 'You are instructed that it was the duty of the employer in this case, the Union Pacific Railroad Company, to use ordinary care and prudence in furnishing plaintiff Powell, at the time of the accident in question, with a reasonably safe place in which to work and to have used all reasonable precaution to maintain and keep such place in a reasonably safe condition.'
 
 
 [12]
 In charging the jury in the Powell case, the court gave no instruction as to negligence on the part of Bedal, or as to a finding by the jury thereon
 
 
 [13]
 That this is the ordinary rule as between two joint tortfeasors was stated in the case of City of Lewiston v. Isaman, 19 Idaho 653, 115 P. 494, 499
 
 
 [14]
 Bedal argues its insufficiency, relying upon Crawford v. Pope & Talbot, 3 Cir., 206 F.2d 784, and cases cited in 42 C.J.S., Indemnity, § 32, p. 617
 
 
 [15]
 Whether under the circumstances the time was reasonable may be subject to proof upon a new trial
 
 
 [16]
 It was stipulated that counsel for the Railroad would testify that had Bedal or his insurance carrier offered to take the defense of the Powell action, the Railroad would not have objected. Of course this circumstance would be unimportant in the absence of notice to Bedal
 
 
 [17]
 Some of the witnesses were permitted to speculate as to the possibility that the log was 'splintered' in falling or skidding, one saying, 'It could have been an unseen splinter there with the load'. There was no testimony that the log was so splintered. In announcing his ruling on the motion for a directed verdict the trial judge expressed the view that the slab 'no doubt was caused to break from the log because of the force of the drop.'
 
 
 [18]
 That case was relied upon this court in Woodworkers Tool Works v. Byrne, 9 Cir., 191 F.2d 667, 674. It does not appear that the rule in Idaho is any different. The recent case of Splinter v. City of Nampa, 74 Idaho 1, 256 P.2d 215, appears to have been based upon the court's finding that the defendant did not have exclusive control of the instrumentality which caused the accident. In cases involving the application of federal law the Supreme Court has given the rule what may be an exceptionally broad and liberal application. See O'Neill v. Baltimore & Ohio Railroad Co., 348 U.S. 956, 75 S.Ct. 447, apparently approving the dissenting opinion in Baltimore & Ohio Railroad Co. v. O'Neill, 6 Cir., 211 F.2d 190; Jesionowski v. boston & Maine R.R., 329 U.S. 452, 457, 67 S.Ct. 401, 91 L.Ed. 416; Johnson v. United States, 333 U.S. 46, 48, 68 S.Ct. 391, 92 L.Ed. 468
 
 
 [19]
 The quoted language is from Sweeney v. Erving, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815, as quoted in the Jesionowski case, supra (329 U.S. 452, 67 S.Ct. 404). That this is no more than a permissible inference which the jury may but is not compelled to accept is the majority rule. See Prosser on Torts, p. 302. We assume that this would be the Idaho view