The PENNSYLVANIA RAILROAD COM-
PANY, Third-Party Plaintiff,
Appellee,

v.

ERIE AVENUE WAREHOUSE CO.,
Third-Party Defendant, Appellant.

No. 13618.

United States Court of Appeals
Third Circuit.

Argued Oct. 20, 1961.

Decided May 2, 1962.

Joseph J. Murphy, Philadelphia, Pa. (George D. Sheehan, Murphy & Sheehan, Philadelphia, Pa., on the brief), for appellant.

Raymond W. Midgett, Jr., Philadelphia, Pa. (Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., on the brief), for appellee.

Before KALODNER, HASTIE and GANEY, Circuit Judges.

HASTIE, Circuit Judge.

This litigation began as a wrongful death action under the Federal Employers' Liability Act by the administratrix of the estate of Edward Day against the Pennsylvania Railroad. While working for the defendant railroad as a brakeman, Day had been crushed to death between a moving train and a wall on the premises of Erie Avenue Warehouse Co., where the railroad serviced a siding. A third-party claim, filed by the railroad, a citizen of Pennsylvania, against Erie, also a citizen of Pennsylvania, under Rule 14, Federal Rules of Civil Procedure, 28 U.S.C.A., broadened the suit to include the additional claim that, should the railroad be found legally responsible for Day's death, the amount of any recovery should be recouped, in whole or in part, from Erie under a contract of indemnity. The railroad paid what all parties now recognize as a reasonable sum in settlement of the Day claim and that action was then dismissed. The subsequent trial of the third-party claim resulted in the railroad's recovery from Erie of the full amount of the Day settlement.

The original claim was within federal jurisdiction because it arose under a federal statute, the Federal Employers' Liability Act. But the third-party claim neither arose under a federal statute nor was asserted between citizens of different states. Independently considered, it was not within federal jurisdiction. However the court below ruled that the third-party claim was so "ancillary" to the original proceeding that no jurisdictional basis was required to support it, beyond the federal question jurisdiction that existed with reference to the principal claim. The correctness of that ruling is the first question on this appeal.

Analytically, an "ancillary" claim of the type we now are considering arises solely because of a principal claim and asserts some right pertaining to the judgment sought on the principal claim. More particularly, both principal and "ancillary" claims arise out of the same injury and the "ancillary" claim seeks either to make the judgment effective or to reallocate the liability. In effect, the supplemental proceeding serves to accomplish full justice with reference to any award made on the principal claim. In the present case, the third-party claim serves to settle a question of liability over as between a principal defendant and a third party without subjecting either to prejudice that might result if the matter should be left to subsequent litigation in a separate action.[1]

---

1. If a prospective indemnitor cannot enter the litigation until a separate suit is brought against him, the judgment theretofore rendered in the original suit may narrow the defenses available to him. Cf. M. Shapiro & Son v. Warwick, 1959, 189 Pa.Super. 445, 150 A.2d 386. On the other hand, if for any reason the first suit does not foreclose relitigation of any issue it decides, in subsequent litigation between indemnitor and indemnitee a reexamination of the nature or validity of the original claim may prejudice the indemnitee. See Orth v. Consumers' Gas Co., 1924, 280 Pa. 118, 122, 124 A. 296, 297.

■ The Supreme Court has long held that the constitutional bounds of federal jurisdiction are not exceeded by broadening an action, that is properly in a federal court, to include various related non-federal claims that are no more intimately connected with the principal claim than is the obviously dependent and supplementary third-party claim here. Moore v. New York Cotton Exchange, 1926, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750; Dewey v. West Fairmount Gas Coal Co., 1887, 123 U.S. 329, 8 S.Ct. 148, 31 L.Ed. 179; Stewart v. Dunham, 1885, 115 U.S. 61, 5 S.Ct. 1163, 29 L.Ed. 329. It follows that the entertaining of the present ancillary claim was a permissible exercise of federal jurisdiction.

■ However, there is the additional question whether the joinder of non-federal claims over against third parties under Rule 14 violates the requirement of Rule 82, Federal Rules of Civil Procedure, that no Rule shall be construed to extend or limit the statutory jurisdiction of the federal courts. We ruled against such a contention in Sheppard v. Atlantic States Gas Co., 3 Cir. 1948, 167 F.2d 841. Such square holdings as there are in other circuits decide that the addition of claims like the present one does not enlarge federal jurisdiction. Dery v. Wyer, 2d Cir. 1959, 265 F.2d 804; United States v. Acord, 10th Cir. 1954, 209 F.2d 709; Waylander-Peterson Co. v. Great Northern Ry., 8th Cir. 1953, 201 F. 2d 408, 37 A.L.R.2d 1399. This conclusion may be justified by demonstrating that analogous or no more closely related non-federal claims were litigated as controversies incidental to federal suits without independent jurisdictional bases before the adoption of the present Rules.

It has long been familiar federal practice to entertain an "ancillary" claim without independent jurisdictional basis, if that claim seeks either to make a principal judgment effective or to make some lawfully required reallocation of the burden imposed by the principal recovery. Such a supplemental proceeding may serve to effectuate a principal judgment by restraining a third person from interfering with its operation. Supreme Tribe of Ben-Hur v. Cauble, 1921, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673. It may achieve full justice by bringing into a suit a third party who should be required to pay the judgment on a claim because of a transfer of property to him in fraud of creditors. Dewey v. West Fairmount Gas Coal Co., supra.

Again, it was familiar practice before the adoption of the present Rules to permit a person whose interest might be affected by the outcome of a diversity case to intervene, regardless of the intervenor's citizenship. Phelps v. Oaks, 1886, 117 U.S. 236, 6 S.Ct. 714, 29 L.Ed. 888 (landlord intervening in suit against tenant); Stewart v. Dunham, supra (additional creditors intervening to share benefits of a creditors' bill). Such intervenors are no more seriously affected by outcome of the principal litigation than is a prospective indemnitor of the defendant. In principle, therefore, an indemnitor's voluntary intervention would be no enlargement of the jurisdiction exercised in the above cited cases. To permit the principal defendant now under Rule 14 to compel his indemnitor to become a party is merely to adopt a new procedure that gives the litigation no broader scope than it could formerly have been given through intervention. We are satisfied no violation of Rule 82 is involved in this case.

■ The question remains whether the settlement of the principal claim and its consequent formal dismissal with prejudice terminated the power of the court to decide the "ancillary" third-party claim. The Supreme Court has from time to time considered the effect of the termination of principal claims upon judicial power to adjudicate pending ancillary claims. When the dismissal of the principal claim has been because the court lacked power from the outset to entertain it, dismissal of the ancillary claim has also been required. Kelleam v. Maryland Casualty Co., 1941, 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899; A. Leschen &

Sons Rope Co. v. Broderick & Bascom Rope Co., 1906, 201 U.S. 166, 26 S.Ct. 425, 50 L.Ed. 710; cf. St. Louis I. M. & So. Ry. v. McKnight, 1917, 244 U.S. 368, 37 S.Ct. 611, 61 L.Ed. 1200. But when the principal claim has been defeated on its merits, power to adjudicate pending ancillary matters has been held to survive. Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; Moore v. New York Cotton Exchange, 1926, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750; cf. Hardenbergh v. Ray, 1894, 151 U.S. 112, 14 S.Ct. 305, 38 L.Ed. 93; Mollan v. Torrance, 1824, 9 Wheat. 537, 22 U.S. 537, 6 L.Ed. 154. It is logical and eminently fair that the present case, where settlement of the principal claim is not substantially different from recovery upon it in creating a need to adjudicate forthwith the ancillary issue of recovery over, be treated like a disposition on the merits. Dery v. Wyer, supra.

This is not to decide that a trial judge would lack discretionary power to dismiss an ancillary claim for policy considerations growing out of the disposition made of the principal claim. But no such adverse policy consideration is urged in this case. Moreover, in refusing to dismiss the ancillary claim the court below pointed out that interrogatories had been filed and answered and other pre-trial steps had been taken in connection with the third-party claim before its dismissal was moved. In all the circumstances, it was reasonable and proper to retain jurisdiction of the third-party claim.

We next state the facts essential to the disposition of this appeal on its merits. The accident in controversy occurred during the execution of a switching operation by the railroad over an industrial siding located on property leased and occupied by Erie. The decedent, Day, was working as a railroad brakeman when his head became wedged and was crushed between the side of a moving boxcar and a concrete retaining wall, a permanent structure close to the sidetrack. The accident occurred in an area where a funnel-like narrowing of the space between the sidetrack and the adjacent retaining wall rather abruptly reduced the lateral clearance of a moving boxcar from 31 inches to a mere 7 inches in approximately 15 feet. This means that the lateral clearance between the track itself and the wall was reduced to less than 3 feet at this point. The trial court found, with ample justification in the evidence, that Day's death resulted from an inadequate and unsafe clearance along side the track. The industrial siding was an old one, and the close clearance in question had existed in 1955, when the railroad contracted to provide Erie with service, and remained unchanged until the fatal accident occurred in 1957.

The trial court ruled and it is not disputed now, that under the Federal Employers' Liability Act the railroad breached its duty to provide its employee Day with a safe place to perform his duties as a brakeman. Accordingly, the railroad properly paid reasonable damages for Day's death in settlement of the principal claim. The matter in dispute is Erie's liability over. This depends upon the legal interpretation and effect of certain indemnity provisions of the agreement between Erie and the railroad under which the siding was used. The trial court, sitting without a jury, awarded the railroad full indemnity, and Erie has appealed.

The agreement in question was drafted by the railroad and signed by both parties on July 28, 1955. The text of paragraphs 7, 8 and 9 of the agreement is set out in the margin.[2] It will be observed

2. "CLEARANCES.

"7. The Industry shall at all times hereafter establish and maintain on its property a clear and safe space above and on each side of the side track sufficient to insure the safety of employees and equipment of the Railroad Company, and the Industry shall indemnify and save harmless the Railroad Company from loss, damage and expense for failure so to do.

"The Industry shall observe and comply with all rules and regulations of the

that paragraph 7 explicitly requires Erie to "maintain on its property a clear and safe space above and on each side of the side track sufficient to insure the safety of employees and equipment of the Railroad Company * * * [and to] indemnify and save harmless the Railroad Company from loss, damage and expense for failure so to do." A similar but more general provision in paragraph 9 requires that the Industry shall "indemnify and hold harmless the Railroad Company for loss, damage and injury of any nature resulting from operation by the Railroad Company over the tracks of the Industry when such loss, damage or injury is due to any unsafe condition of the premises of the Industry."

We need not decide whether these two provisions are partially overlapping. It is sufficient for present purposes that they seem to provide full indemnity to the railroad for harm it may suffer as a result of unsafe conditions, and particularly close clearances, that Erie shall have permitted to exist on its property.

It must be considered, however, whether the circumstances of this accident make these full indemnity provisions inoperative and prevent the imposition of any greater responsibility upon Erie than the requirement of paragraph 9 that "if

any claim or liability, other than from fire caused by locomotives as aforesaid, shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally." This provision for equal sharing of the burden of joint or concurring negligence cannot reasonably be construed to mean that full indemnity shall be denied whenever the railroad has been sufficiently at fault to be legally liable for the injury of a third person since occasion for indemnification in connection with an injury to a third person normally arises only when some fault is chargeable to the indemnitee. A major purpose of the full indemnity provisions of paragraphs 7 and 9 must have been to shift ultimate responsibility to Erie in some situations where the law makes the railroad responsible to a third person for a wrongful injury. Baltimore & Ohio R.R. v. Alpha Portland Cement Co., 3d Cir.. 1955, 218 F.2d 207; Booth-Kelly Lumber Co. v. Southern Pac. Co., 9th Cir. 1950, 183 F.2d 902, 20 A.L.R.2d 695. The agreement to share liability equally, as stated in paragraph 9, becomes operative only if, in relation to a third person the parties are joint tortfeasors and the circumstances of the given case make the undertaking to pay full indemnity inapplicable.

Railroad Company governing the handling of inflammable liquids, including loading and unloading of tank cars, the location of racks and storage tanks, and protection of oil sidings from danger due to stray electric currents."

"Fire.

"8. It is understood that the movement of railway locomotives involves some risk of fire, and the Industry assumes all responsibility for and agrees to indemnify the Railroad Company against loss or damage to property of the Industry or to property upon its premises, regardless of Railroad Company negligence, arising from fire caused by locomotives operated by the Railroad Company on the side track, or in its vicinity, for the purpose of serving the Industry, except to the premises of the Railroad Company and to rolling stock belonging to the Railroad Company or to others, and to shipments in the course of transportation."

"Liability Other Than Fire.

"9. The Industry also agrees to indemnify and hold harmless the Railroad Company for loss, damage or injury from any act or omission of the Industry, its employees or agents, to the person or property of the parties hereto and their employees, and to the person or property of any other person or corporation, while on or about the side track. If any claim or liability, other than from fire caused by locomotives as aforesaid, shall arise from the joint or concurring negligence of both parties hereto it shall be borne by them equally. The Industry also agrees to indemnify and hold harmless the Railroad Company for loss, damage or injury of any nature resulting from operation by the Railroad Company over the tracks of the Industry when such loss, damage or injury is due to any unsafe condition of the premises of the Industry."

■ Full indemnity may be barred by the fault of the party claiming it. Seeking to establish that this is such a case Erie has invoked the doctrine of "acquiescence", a widely recognized defense in this area. Perhaps the most frequently quoted general statement of this doctrine appears in Section 95 of the Restatement of the Law of Restitution:

"Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition."

This doctrine has been applied most frequently where the right to indemnity has been created by the common law of restitution apart from any contract to indemnify. More than sixty years ago, in sustaining a claim to indemnity, the Supreme Court of Pennsylvania recognized this defense to the extent of pointing out that on the facts of the case at hand the indemnitee had not "in any way co-operated with the defendant [indemnitor] in his neglect to perform the duty which, as between * * * [these parties] he assumed to discharge." Brookville Borough v. Arthurs, 1893, 152 Pa. 334, 340, 25 A. 551, 556. Recently, in Baltimore & Ohio R. R. v. Alpha Portland Cement Co., supra, this court, faced with a problem of indemnity claimed under a railroad siding agreement, quoted and used Section 95 of the Restatement of Restitution as an essentially correct statement of Pennsylvania law in the light of which a Pennsylvania contract should be construed. Still more recently, in Kennedy v. Pennsylvania R. R., 1960, 282 F.2d 705, another suit for indemnity, we found it appropriate to remand the controversy to the district court for a new trial to determine whether there was a contractual obligation to indemnify and whether, on the facts, the claim of the railroad against the landowner for full indemnity was barred by acquiescence as that concept is set out in Section 95 of the Restatement of Restitution. This was a square holding that the doctrine of acquiescence limits the recovery of contractual indemnity in Pennsylvania.

Although the Supreme Court of Pennsylvania has not considered this question, our view of Pennsylvania law is supported by the fact that the Superior Court of that state has quoted section 95 with approval. See Georges v. Reading Co., 1948, 162 Pa.Super. 475, 478, 58 A.2d 191, 192. Moreover, the Court of Common Pleas of Allegheny County has applied section 95 as a correct statement of controlling law in Deutsch v. P. C. & Y. Ry., 1956, 7 Pa.Dist. & Co.R.2d 505.

It remains to consider what in general constitutes indemnity-defeating acquiescence by the indemnitee in the indemnitor's wrong, and whether the present record establishes such acquiescence. Basically, we think the concept covers comprehensively a variety of situations in which courts think that a party should be denied indemnity because his own conduct has been so blameworthy and has so contributed to the harm in question that full restitution is inequitable or cannot properly be viewed as within the intended coverage of an agreement to indemnify.

■ One hallmark of such acquiescence is long continued awareness of a dangerous situation by the indemnitee without either taking any corrective measure or calling upon the indemnitor to do so. E. g., Bedal v. Hallack & Howard Lumber Co., 9th Cir. 1955, 226 F.2d 526; Owensboro City Ry. Co. v. Louisville H. & St. L. Ry., 1915, 165 Ky. 683, 178 S.W. 1043; Deutsch v. P. C. & Y. Ry., supra. In the present case the railroad had used the siding despite the close clearance here involved before the present siding agreement was executed. It

continued to do so under this agreement for two years before the present accident occurred. It had in its possession a chart showing the relation of the track to adjacent structures. The record is clear that the railroad made periodic inspections of the sidetrack. It is equally clear that the railroad's operating employees had complained to their superior of close clearances of this siding. Indeed, answering an interrogatory in this case the railroad cited a yardmaster's report that "verbal complaints have been received from time to time from train and engine service employees during the past couple years, * * * their comments being to the general effect that it is a mean and dangerous place to drill cars".[3] The court below minimized the railroad's awareness of the danger, stating that the particular spot where this accident occurred had never been mentioned as specially dangerous. But since the entire siding covered no vast area and clearance was reduced so greatly and so sharply at the point of the accident, normal use of the siding, periodic routine inspections and appropriate investigations of the complaints of employees would necessarily have focused the attention of a prudent operator upon the hazard which caused this accident. We think the conclusion is required by the present record that the railroad had been adequately alerted to the dangerous condition which caused this accident long before the mishap occurred. Yet, it is not disputed that the railroad neither took any corrective action itself nor called upon Erie to do so.

The conduct of the railroad is made all the more blameworthy by the fact that, beyond awareness that any switching operation in this area was hazardous, it had received a conductor's report warning that the hazards on this siding were such that cars should be moved in daylight. Despite this warning, it multiplied the risk of injury on the occasion of this accident by conducting switching at night and by assigning to this hazardous task employees, including the deceased, who had never operated on this siding before. In these circumstances, we think the evidence compels the conclusion that the conduct of the railroad with reference to a special risk to which it had been alerted was so blameworthy that acquiescence must be deemed to bar full indemnity.

We are all the more confident of this conclusion because, apart from the formulated doctrine of acquiescence, the Pennsylvania cases repeatedly express the reluctance of the courts of that state to read indemnity contracts as intended to protect the indemnitee from loss attributable to his own blameworthy conduct. E. g., Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc., 1961, 404 Pa. 53, 171 A.2d 185; Perry v. Payne, 1907, 217 Pa. 252, 66 A. 553, 11 L.R.A., N.S., 1173. We think the fact that the railroad drafted the present contract would increase the reluctance in the present case.

Although the fault of the railroad was serious enough and sufficiently distinct from Erie's fault to preclude the railroad from recovering full indemnity from Erie, the combination of distinct blameworthy acts and omissions of the two parties brought the case within the provision of paragraph 9 of the siding agreement that the parties shall bear equally liability arising from their joint or concurring negligence. Erie did not discharge its assumed obligation to maintain safe clearances. The railroad, aware of the danger, operated in a way that magnified it.

Only brief mention need be made of a minor point. Erie has objected to the award of interest on the railroad's claim. The objection is not well taken. The limited contribution required in this opinion is a normal contractual recovery

3. The court below took the position, incorrectly we think, that this was hearsay and not competent evidence. Actually it was the fact that complaint had been made, not the correctness of the complaint, which should have been considered.

# 850

upon which interest may be awarded from the time that Erie was advised that the railroad had settled a liability which it had agreed to share.

The judgment will be vacated and the cause remanded for the entry of a new judgment consistent with this opinion.