483 F.2d 29
 Martin W. LINDEN, Plaintiff,
v.
CHICAGO, BURLINGTON & QUINCY RAILROAD, a corporation, and
Farmers Elevator Mutual Insurance Company, a
corporation, Defendants.
CHICAGO, BURLINGTON & QUINCY RAILROAD, a corporation, Third
Party Plaintiff, Appellant,
v.
HOLDREGE COOPERATIVE EQUITY EXCHANGE, a corporation, Third
Party Defendant, Appellee.
 No. 72-1772.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 17, 1973.
Decided Aug. 15, 1973.
 
 Harry B. Otis, Omaha, Neb., for appellant.
 William B. Craig, Omaha, Neb., for appellee.
 Before MATTHES, Chief Judge,* and LAY and STEPHENSON, Circuit Judges.
 STEPHENSON, Circuit Judge.
 
 
 1
 This cause of action arose initially out of a construction agreement (Unloading Pit Agreement) between defendant-third party plaintiff, Chicago, Burlington & Quincy Railroad Co. (C.B. & Q.) and third party defendant, Holdrege Cooperative Equity Exchange (Holdrege) under which C.B. & Q. granted permission to Holdrege to construct an unloading pit in and under trackage operated by C.B. & Q. at Holdrege, Nebraska. The pit would be used by Holdrege in connection with the unloading of railroad cars.
 
 
 2
 In an order dated April 24, 1972, the trial court entered judgment (filed on November 27, 1972) against C.B. & Q. in the amount of $22,000.00, together with costs in favor of plaintiff, Mark W. Linden, a Holdrege employee, who had been negligently injured while working underneath a hopper car located upon tracks at the west side of an under track unloader pit. The site was covered by an indemnification provision entitled paragraph "3" of the Unloading Pit Agreement. In its order, the trial court reserved the right to determine whether C.B. & Q. ultimately would be indemnified by Holdrege.
 
 
 3
 On November 14, 1972, the trial court ordered that C.B. & Q.'s third party complaint against Holdrege be dismissed upon the merits. It held that the injury sustained by Linden was not intended to be within the scope of liability as expressed by the parties in the indemnity provision.
 
 
 4
 It is from this decision that C.B. & Q. appeals. We reverse.
 
 
 5
 The trial court adopted the stipulation of facts submitted by the parties. In its memorandum of November 14, 1972, the trial court stated that the terms of the agreement relative to injuries "'arising out of' . . . can be read to cover any and all injuries or damages that merely occur at the situs of the unloading pit or it can be read less broadly, . . . to cover any and all injuries which have a nexus or casual relationship to the unloading pit." It applied the strict rule of construction and rejected the first broad construction, and held that the situs alone was insufficient. It stated that the injury must be "within a class of injuries reasonably associated with the unloading pit to the degree that the parties could be said to have anticipated the occurrences . . ." C.B. & Q. was precluded from recovering because it failed to establish that the negligent act in question would "be more likely to occur by reason of the unloading pit facility," and that the resulting damage was not shown "to be of a class within the expectations of the parties."
 
 
 6
 The relevant facts, as stipulated, are as follows: That on the date of the accident, May 6, 1968, the Unloading Pit Agreement was in full force and effect and binding upon C.B. & Q. and Holdrege and covered the designated unloading pit only. Paragraph 3 of the Agreement reads as follows:
 
 
 7
 "The Industry [Holdrege] further agrees to indemnify and save harmless the Railroad Company [C.B. & Q.] against all claims, demands, suits, actions, judgments, loss, costs and expense (including attorneys' fees) for death of or injury to, or loss of or damage to the property of, any person or persons whomsoever, including the parties hereto and their employees, whether caused by the negligence of the Railroad Company, or otherwise, in any manner arising out of the construction, maintenance, operation, use, existence, or removal of said unloading pit, and/or out of the restoration of, or failure to restore, the roadbed and track as in Sextion 4 provided." (emphasis supplied)
 
 
 8
 That at sometime prior to 5:00 p.m. on the date of the accident, a storm came up suddenly; that employees of both C. B. & Q. and Holdrege were of the impression that it would be severe, and began to take precautionary measures; that during the day, prior to the advancing storm, C.B. & Q. had placed a hopper car (car #1) over an "under track unloader" adjacent to the Holdrege Cooperative Elevator; that the point where this car was spotted was in the area described in the Unloading Pit Agreement; that C.B. & Q. employes spotted a second hopper car (car #2) on trackage at a point approximately 600 feet to the west of the unloading pit- not in the area described in the Agreement; that as the storm became imminent, C.B. & Q.'s brakemen attempted to make sure that the brake was on car #2; that the brakemen "spun the brake wheel probably about twice" and "threw a blocking piece of wood under and towards the wheels of said car;" that car #2 was not spotted for use in connection with the unloading pit but was placed by C.B. & Q. and remained under its care and control; that at or near the same time, Linden proceeded to car #1 for the express purpose of closing the car's hopper because of the storm; that Holdrege's manager saw from his office window car #2 moving down the track toward car #1 under which he knew Linden was working; that a Holdrege employee ran from the office to warn Linden, but to no avail because of thunder, wind and noise; that another Holdrege employee jumped aboard car #2 but was not able to prevent impact with car #1, which was pushed an approximate distance of fifteen feet.
 
 
 9
 At the time of the accident, Linden was under car #1 using a broom to clean fertilizer which had spilled on the railroad tracks and ties beside the unloader and on top of its lid, which had been removed in order to allow the unloader to be used. As a result of the impact, Linden was dragged, crushed and pushed the approximate distance travelled by car #1 after impact.
 
 
 10
 The issue dispositive of this cause is whether by the terms of the indemnity provision the parties intended Holdrege to be liable for loss such as that incurred by Linden while performing his work.
 
 
 11
 At the outset, we note that this indemnity agreement does not, as Holdrege suggests, contravene Article X, Sec. 4 of the Nebraska constitution, which precludes railroad corporations from limiting their liability when operating as common carriers. The contract was not executed by C.B. & Q. in its capacity as a common carrier. C.B. & Q. had no public duty to consent to the construction of the unloading pit by Holdrege, and it was at liberty to lawfully bargain for indemnity against its own negligence in this instance. See, Luedeke v. Chicago & N. W. R. Co., 120 Neb. 124, 231 N. W. 695, 696-697 (1930); accord, Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. Co., 199 F.2d 725, 729 (8th Cir. 1952) (applying Minnesota law), and, Michigan Millers Mut. Fire Ins. Co. v. Canadian North Ry. Co., 152 F.2d 292, 294-295 (8th Cir. 1946) (applying Minnesota law); see also, 6A Corbin on Contracts, Sec. 1472 (1962).
 
 
 12
 In accordance with the Supreme Court's pronouncement in United States v. Seckinger, 397 U.S. 203, 211, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970), C.B. & Q. should not be permitted to recover for its own negligence unless we are convinced that such was the intention of the parties pursuant to the indemnity provision. Consistent with Nebraska law, we are governed by the rules applicable to construction and interpretation of contracts generally. It is our duty to fairly and reasonably interpret the language and terms of the indemnity provision based upon a reading of the contract in its entirety. Currency Services, Inc. of Minnesota v. Passer, 178 Neb. 286, 133 N.W.2d 19, 21 (1965).
 
 
 13
 The critical language in the indemnity provision, upon which we find liability on the part of Holdrege, states that C.B. & Q. would be indemnified by Holdrege against liability "whether caused by the negligence of the Railroad Company, or otherwise, in any manner arising out of the construction, maintenance, operation, use, existence, or removal of said unloading pit." (Emphasis supplied)
 
 
 14
 Holdrege urges that this clause be narrowly construed to include indemnification only where the unloading pit performed an active part in bringing about the injury or damage. Holdrege refers us to Luedeke v. Chicago & N. W. R. Co., supra, 120 Neb. 124, 231 N.W. 695 (1930) as weighing heavily in its favor. We disagree. In Luedeke, a dry gas unloading device was the subject of an indemnity agreement which did not contemplate indemnification for loss unas-sociated with the use of the unloading device. Id. at 697. The facts of Luedeke show that fire equipment was unable to reach buildings damaged by an explosion in the unloading pit because the railroad's freight cars had blocked the access route to the burning property. The Nebraska court held that under these facts, the contract as written did not free the railroad of liability since the alleged negligence was "not caused by the use of the unloading device," (emphasis supplied) as required by the indemnity provision in that instance.[1] The court reasoned that although the fire and resultant loss arose out of the use of the unloading device, the action was not brought to recover loss due to the fire, but only loss based upon the railroad's act of negligently blocking the access route for an unreasonable length of time. Id.
 
 
 15
 The language in the indemnity provision before us mandates a different result than that reached in Luedeke. See generally, Missouri Pacific Railroad Co. v. Winburn Tile Mfgr. Co., 461 F.2d 984, 986-988 (8th Cir. 1972) (applying Arkansas law). The plain and ordinary meaning attributed to the phrase "in any manner arising out of the construction, maintenance, operation, use, existence, or removal of said unloading pit," (emphasis supplied) does not, as Holdrege would have it, contemplate a showing of "proximate cause," cf., Insurance Co. of North America v. Royal Indemnity Co., 429 F.2d 1014, 1018 (6th Cir. 1970), but instead contemplates only a causal connection between the unloading pit facility and the injury, which connection we believe is adequately demonstrated upon this record.
 
 
 16
 As stipulated by the parties, Linden's presence in the unloading pit was incidental to his work. He had proceeded to car #1, which was situated over the under track unloader, for the express purpose of closing the hopper on the railroad car because of the storm, and was injured in the performance thereof. See, Aluminum Co. of America v. Hully, 200 F.2d 257, 263 (8th Cir. 1952) (applying Iowa and Pennsylvania law).[2] Had Linden been injured at the site, but as a casual observer or passer-by and not in the furtherance of Holdrege's business it would be more difficult to find that such an occurrence was contemplated by the agreement. We are convinced, however, that in this case the scope of Holdrege's liability has been clearly established as including the injury to Linden "arising out of the . . . maintenance, operation, use" and/or "existence" of the unloading pit and as being in "a class [of injuries] within the expectations of the parties."[3] We therefore reverse the decision of the district court and remand this cause with instructions to enter judgment upon the third party complaint in favor of C.B. & Q.
 
 
 17
 Reversed and remanded.
 
 
 
 *
 Senior Circuit Judge, effective July 15, 1973
 
 
 [1]
 The indemnity provision in Luedeke reads in pertinent part as follows: "The licensee assumes and agrees to pay for all loss or damage to property, and injury to or death of persons, including costs and expenses incident thereto, caused by the construction, installation, maintenance, presence or use of said pipe or pipes or said unloading device, or by reason of any failure to lock, maintain or remove the movable connections as hereinbefore provided or by their presence or use upon the property of the railway company, or by the failure of the licensee or the officers, agents or employees of the licensee to abide by or comply with any of the conditions of this licensee."
 
 
 [2]
 In Hully, the qualifying phrase ". . . or in any manner connected with . . ." is added to "arising out of" in the indemnity provision. The distinction is not critical, however, since the language in the present case is sufficiently broad and encompassing to find liability on the part of Holdrege
 
 
 [3]
 See also, Fix Fuel and Material Co. v. Wabash Railroad Co., 243 F.2d 110, 115 (8th Cir. 1957). But note that in Fix Fuel the railroad could not recover from its lessee under a contract of indemnity similar to the one before us unless both parties were negligent. We held that evidence sustained the district court's finding that the injured Fix Fuel employee contributed to his own injury, and that the railroad was therefore entitled to indemnification. The critical indemnity language in the Fix Fuel contract reads as follows: ". . . arising from or growing out of, directly or indirectly, the existence, operation, use or maintenance of such unloading pit, or its removal."