LOY RANDALL ET AL., APPELLANTS, V. LYDIA ERDMAN, APPELLEE.

231 N. W. 2d 689

Filed July 24, 1975. No. 39819.

Wright & Simmons, for appellant.

Richard A. Douglas of Herman & Herman, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, Mc-COWN, NEWTON, CLINTON, and BRODKEY, JJ.

WHITE, C. J.

In this action for the specific performance of an option to purchase real estate, the District Court rendered a summary judgment in favor of the defendant. The plaintiffs appeal and contend that the District Court erred in not granting summary judgment in their favor decreeing performance of the option to purchase. We reverse the judgment of the District Court and grant summary judgment in favor of the plaintiffs.

On December 30, 1970, the plaintiffs, Loy Randall

and Marian Randall, and the defendant, Lydia Erdman, executed a contract in which the defendant leased certain land which she owned to the plaintiffs. The lease was for a term of 1 year from January 1, 1971, to December 31, 1971. The lease granted to the plaintiffs an option to extend the lease under the same conditions for two additional terms of 1 year each, conditioned upon written notice to the defendant 30 days prior to the termination of the lease or the extension thereof. Paragraph 9 of the leasing contract also gave the plaintiffs the option to purchase the property upon giving written notice 30 days prior to the expiration of the lease or an extension thereof. This clause provided, in the event of the exercise of the option, that the plaintiffs were to pay the defendant $25,000 at the time of the exercise of the option to purchase.

Central to the question involved in this case is the dispute as to the performance of paragraph 5 of the lease which dealt with the use of the grazing land for cattle. Paragraph 5 provided: "Lessee agrees that he will pasture on said lands no more than 165 head of cows or 400 head of yearlings the year round."

In February 1971, the plaintiffs began to move cattle on the property. By April 1971, the plaintiffs had over 200 head of cattle on the property, a condition which continued until the last week in October 1971. At this time the plaintiffs removed all the cattle to adjacent land which was also in their possession. Then, on December 8, 1971, the plaintiffs moved over 200 head of cattle back onto the defendant's property. A dispute almost immediately arose concerning the number of cattle permitted on the property under paragraph 5 of the lease. The defendant interpreted paragraph 5 as meaning that at no time could there be more than 165 head of cattle on the property. The plaintiffs, however, alleged that at some time during 1971, the defendant had told them that for purposes of interpreting paragraph 5 of the lease, the number of cattle could be

*averaged* between the land which the plaintiffs leased from the defendant and the adjacent land in the possession of the plaintiffs. The record is silent as to what figure would have resulted from the averaging.

The contention of the defendant was that the plaintiffs were overgrazing under the terms of the lease. She became disturbed. On January 3, 1972, the plaintiffs received a letter written by the defendant's attorney on December 31, 1971, stating that due to the plaintiffs' failure to follow the terms of paragraph 5 of the lease as to the number of cattle grazing on the property, the defendant was terminating the lease as of March 31, 1972, *unless satisfactory arrangements were made before January* 31, 1972. There was an exchange of letters which did not resolve the problem. On January 17, 1972, the plaintiffs' attorney sent a letter to the defendant's attorney, along with the plaintiffs' check for the *1972 rent,* urging that the defendant accept the check. The letter stated *that the plaintiffs intended to move enough cattle off the property so that there would be no more than 165 head of cattle remaining.* A week later, in a letter dated January 24, 1972, the defendant, through her attorney, accepted the proposal. The letter stated that the defendant accepted the rent check since the plaintiffs had removed enough cattle from the property, but that the defendant was not waiving any rights to insist on her *"interpretation of Paragraph 5 of the lease." The plaintiffs' check for rent was cashed by the defendant.* This resolution of the dispute and the problem is demonstrated by the fact that there is no indication or contention that any dispute arose between the parties during the remainder of 1972 or 1973 as to overgrazing. We observe that in the record there is now a contention there were in excess of 165 head of cattle on the property during the period of 1972 and 1973. In any event, in December 1972, the defendant accepted the rental payment *for the year 1973.*

Pursuant to the option clause in the contract, on No-

vember 1, 1973, the plaintiffs sent the defendant a check for $25,000, the amount of the downpayment under the option clause. The defendant endorsed the check and deposited it in her savings account in a savings and loan association. The defendant received a letter, dated November 20, 1973, from the plaintiffs' lawyer stating that the letter was written notice of the plaintiffs' exercise of the option to purchase. The plaintiffs then purchased insurance for the buildings on the property. On or about December 11, 1973, the defendant wrote a letter to the plaintiffs which indicated that the defendant fully intended at that time to sell the property. The letter, in fact, mentioned that the abstracts were being prepared for examination by the plaintiffs. Between December 11, 1973, and January 25, 1974, the defendant changed her mind, and in a letter dated January 25, 1974, she advised, through her attorney, the plaintiffs' lawyer that the defendant had decided not to sell the property. On the same date the defendant tendered a check for $25,000 to the plaintiffs, labeling it as a return of the plaintiffs' downpayment. The plaintiffs did not cash the check, and returned it to the defendant in a letter dated February 1, 1974.

At the hearing on this case, both parties moved for summary judgment. The District Court granted the defendant's motion for summary judgment on the basis that the option was no longer binding. A fair inference from the record is the District Court held that the plaintiffs breached the contract as to the grazing provision (paragraph 5), and that therefore the lease terminated on December 31, 1971. Implicit in the District Court's holding granting summary judgment to the defendant, was the finding that the option did not exist in November 1973 because of the previous breach, and that the attempt to exercise and the cashing of the check by the defendant was an exercise in futility.

A motion for summary judgment can be granted only where there is "no general issue as to any material fact

in the case and where under the facts he is entitled to judgment as a matter of law." Green v. Village of Terrytown, 189 Neb. 615, 204 N. W. 2d 152. See, also, Friedrich v. Anderson, 191 Neb. 724, 217 N. W. 2d 831; Grantham v. General Tel. Co. of Midwest, 191 Neb. 21, 213 N. W. 2d 439. The party moving for a summary judgment has the burden of showing that no issue of fact exists, and the court should consider all the evidence in the light most favorable to the party opposing the motion. See, Fay Smith & Associates, Inc. v. Consumers Public Power Dist., 172 Neb. 681, 111 N. W. 2d 451 (1961); Youngs v. Wagner, 172 Neb. 735, 111 N. W. 2d 629 (1961); Green v. Village of Terrytown, *supra*.

The District Court was clearly wrong in granting summary judgment to the defendant. Assuming, arguendo, that the breach of the overgrazing clause (paragraph 5) was a material issue, the question of whether the plaintiffs breached the clause was clearly in dispute. We will not rehearse this dispute further except to state that in an affidavit, Loy Randall, one of the plaintiffs, stated that the defendant had agreed to the plaintiffs' interpretation of paragraph 5, the clause dealing with overgrazing. In an answer to the defendant's interrogatories, the plaintiffs alleged a similar understanding between the plaintiffs and the defendant. It was the duty of the court to view the evidence in the light most favorable to the plaintiffs. The plaintiffs' evidence clearly showed that there was an issue as to a material fact, assuming that such fact was material to a judgment for the defendant. We therefore reach the point in the decision in this case that summary judgment for the defendant was erroneous.

But, as we view it, the decision upon this "question of fact" is immaterial to the proper resolution of this controversy on a joint motion for summary judgment. Whatever the merits of the dispute as to the overgrazing of the land under paragraph 5, in the years 1971 and 1972, the parties had resolved the controversy by their

conduct and particularly by the defendant's acceptance of the rent and the renewal successively of the two 1-year options provided for in the original leasing contract. Generally, a party cannot accept the benefits of a contract, and then claim that the contract is forfeited. In Einot, Inc. v. Einot Sales Co., Inc., 154 Neb. 760, 49 N. W. 2d 625, this court said: " '* * * that where a party to a contract, *with knowledge of a breach by the other party, receives money in the performance of the contract, he will be held to have waived such breach.'* " (Emphasis supplied.) See, also, Wegner v. West, 169 Neb. 546, 100 N. W. 2d 542; McLeod v. Crawford, 176 Neb. 513, 126 N. W. 2d 663.

This broad general rule of contract construction has been applied to the landlord-tenant area, where the lessor refuses to allow a lessee to exercise an option to purchase due to the lessee's breach of a provision in the lease. The general rule is well stated in an extensive annotation in 53 A. L. R. 3d 435, at page 449. Therein it is stated: "Accordingly, the courts have generally held that the acceptance of rent after the lessee's breach or default in the terms of the lease constitute a waiver of the default so as to entitle the lessee to enforce the option to purchase." In Chesnut v. Master Laboratories, 148 Neb. 378, 27 N. W. 2d 541, this court rejected an argument that the breach of a nonassignability clause in a lease could be asserted after the lessor's acceptance of the rent because, the court held, that the lessor waived any breach of the lease by such acceptance. See, also, Jamson v. Poulos, 184 Neb. 480, 168 N. W. 2d 526. We observe that, in a broad sense, the parties themselves here, by their conduct, had settled any contention as to the validity of the contract by the continuation of the possession of the property by the plaintiffs and the acceptance of the rent in the two subsequent years of 1972 and 1973. On principle here, the parties had interpreted and resolved the dispute as to the overgrazing clause, and they did all this while engaged in the per-

formance of the contract, with full knowledge of the terms of the contract and the nature of the dispute. We have said many times that the interpretation given a contract by the parties themselves while engaged in the performance of it is one of the best indications of the true intent of the contract and of the parties. Such a construction of the contract should ordinarily be enforced. Lortscher v. Winchell, 178 Neb. 302, 133 N. W. 2d 448.

Because of our holding herein that the plaintiffs are entitled to a summary judgment for enforcement of the option to purchase, we pursue the relevant facts in minute detail. Under the principles of law already recited that are applicable to this case, defendant's receipt and cashing of the plaintiffs' checks accomplished an inescapable waiver of any claimed prior breach of the grazing provisions of the lease. She claims that the plaintiffs first breached the terms of the lease in *April 1971*. Yet the defendant received and cashed in January 1972 the plaintiffs' check for $9,200 in payment for rent for the year 1972. In December of 1972, the defendant received and then cashed another check for $9,200 which was in payment for rent for the year 1973. And again, on November 1, 1973, the defendant received a check from the plaintiffs for $25,000, which the plaintiffs represented as the downpayment on the purchase price under the option terms of the lease (paragraph 9). The defendant accepted the check and cashed it, placing the funds in her savings account. The defendant received these three checks *after* she was aware of what she considered to be a breach of the lease by the plaintiffs, yet she nevertheless cashed the checks, thereby waiving her right to claim that the plaintiffs breached the provisions of the lease.

But the defendant's waiver of any possible breach by the plaintiffs as to the grazing clause manifested itself in ways other than the acceptance of money. The letter from the plaintiffs' attorney to the defendant's attor-

ney, dated January 17, 1972, and the return letter, dated January 24, 1972, taken together indicate that the situation at that time was satisfactory to the defendant. This is true because these letters state that the defendant did not waive any right to insist upon her *interpretation* of the lease provisions, but it appears that the letters were referring to future disputes, and not past disputes. These letters conclusively show that the defendant agreed to an extension of the lease, irrespective of the crucial acceptance of the rent checks. It therefore appears that by extending the lease and accepting the rent money, and by the peaceful possession by the plaintiffs, with knowledge of all the circumstances, the defendant waived any possible claim of prior breach by the plaintiffs.

We point out that at no time since January 1, 1971, has the defendant taken any action to remove the plaintiffs from the premises. All the defendant's actions have been consistent with the notion that the plaintiffs were legitimate tenants. After allowing the plaintiffs to remain on the premises and accepting their rent, the defendant cannot now claim that the plaintiffs violated the terms of the lease and retroactively reject the operation of paragraph 9 providing for the option to purchase, and reject her clear and unequivocal receipt and cashing of the downpayment on the option, which she accepted and cashed, and arranged for the bringing of the abstracts of title up to date in order to consummate a final settlement.

In further detail, we call attention to the defendant's letter to the plaintiffs dated December 11, 1973, over 1 month after the defendant received and cashed the $25,000 downpayment check. This letter clearly shows that the defendant planned on recognizing the option to purchase.

It was not until approximately January 25, 1974, almost 3 months after receiving the $25,000 check for the downpayment, that the defendant took any action to

render the option invalid. This was too late. We hold that after acting as though the lease was effective and receiving all the benefits of the lease, the defendant cannot now be heard to challenge the validity of the lease, nor paragraph 9 providing for the option purchase contained in the lease. We therefore come to the conclusion that, as matter of law, the plaintiffs are entitled to a summary judgment in their favor enforcing the option agreement.

Generally, an order denying a motion for summary judgment is interlocutory in nature, and hence not appealable. But this court recognized in Lesoing v. Dirks, 157 Neb. 183, 59 N. W. 2d 164, that when both parties file motions in the District Court for summary judgment, this court can consider the motions of both parties and determine the controversy. This rule is recognized in other jurisdictions. See, 15 A. L. R. 3d 899; Stewart v. United States, 186 F. 2d 627 (7th Cir., 1951); Tobin v. Garcia, 159 Tex. 58, 316 S. W. 2d 396 (1958); Algernon Blair, Inc. v. National Surety Corp., 222 Ga. 672, 151 S. E. 2d 724 (1966). In this case both parties moved for a summary judgment. The above rule is in harmony with our summary judgment statutes. Section 25-1333, R. R. S. 1943, provides that the court: "* * * shall if practicable ascertain what material facts exist without substantial controversy * * *" and further provides: "It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and *directing such further proceedings in the action as are just.*" (Emphasis supplied.) We therefore hold that under the undisputed material facts in this case the plaintiffs' motion for summary judgment should have been granted and the District Court is directed to enter such judgment accordingly.

The judgment of the District Court granting summary judgment to the defendant is reversed and the cause is

remanded with directions to enter judgment for the plaintiffs.

REVERSED AND REMANDED WITH DIRECTIONS.