**CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, a Nebraska Corporation, Plaintiff,**

**v.**

**DEVONSHIRE COVERAGE CORPORATION, a California Corporation, Defendant.**

Civ. No. 74–0–300.

United States District Court, D. Nebraska.

July 16, 1976.

·Francis P. Matthews, and Martin Cannon, of Matthews, Kelley, Cannon & Carpenter, P. C., Omaha, Neb., for plaintiff.

John W. Morrison, of Karon, Morrison, Savikas, Ltd., Chicago, Ill., and Harry L. Welch, of Gross, Welch, Vinardi, Kauffman & Day, Omaha, Neb., for defendant.

RICHARD E. ROBINSON, Senior District Judge.

This matter is before the Court after trial to the Court without a jury. Jurisdiction is established under 28 U.S.C.A. § 1332 (1966). In this action the plaintiff, Central National Insurance Company of Omaha, Nebraska, has filed suit against the defendant, Devonshire Coverage Corporation of Los Angeles, California, for breach of contract.

I.

On February 1, 1970, the plaintiff, insurance company, and the defendant, insurance agency, entered into an "Agency Agreement"[1] which authorized the defend-

---

1. The Agency Agreement (PE1) is, in fact, an agreement between the defendant, Devonshire, and Protective Insurance Underwriters, Inc. The latter is an affiliate of the plaintiff, Central National, and entered into the Agency Agreement pursuant to authority granted it by Cen-

ant to write certain types of property insurance contracts on behalf of the plaintiff.[2] From the inception of the Agency Agreement until December 1, 1972, the parties conducted business on the basis of their written agreement, as modified or supplemented by an oral agreement that the defendant would not obligate the plaintiff to any single risk which was valued in excess of $1 million unless the defendant provided reinsurance to cover the risk in excess of $1 million.[3] This oral agreement was amended in a written addendum to the Agency Agreement, on December 1, 1972, which provided in pertinent part:

"A. LIMITATIONS

. . . . .

2. With respect to risks incepting on or after December 1, 1972, the General Agent (Devonshire) will not write risks in excess of $500,000 total sum insured for any risk (irrespective of the PML) unless reinsured as follows. Should the amount of the total sum insured on any one risk exceed $500,000 then the excess over the above-mentioned $500,000 limitation must be reinsured on a pro rata basis, not on an excess of loss basis, with financial (sic) sound and reputable reinsurers.

. . . . .

4. In the event that the General Agent exceeds or violates any one of the above limitations or if the General Agent does not provide valid and collectable reinsurance in accordance with these limitations then in such event the General Agent shall indemnify and hold harmless the . . . (plaintiff) from and against all claims, judgments, judgments (sic) or liabilities, including interest and reasonable costs of defense. . . ."

■ On December 19, 1972, the defendant agency wrote policy number SMP 59 83 77 bearing an effective date of December 31, 1972. In general, this policy provided blanket insurance coverage [4] on five (5) separate locations in Pennsylvania and Texas. Location number "1" under the policy is identified as Drexelbrook, which is an apartment complex with Clubhouse and Shopping Center in Upper Darby, Pennsylvania. The policy indicates that the Drexelbrook Complex was insured on a blanket basis in the amount of $9,190,000 for buildings, $160,000 for contents, $1,280,000 for rents, and $150,000 for gross earnings, totalling $10,780,000. However, since the Drexelbrook Complex is composed of 463 separate units, only the Drexelbrook Clubhouse was assigned a value for underwrit-

---

tral National. The evidence has shown that the agreement itself was negotiated between Devonshire and the principal officers of Central National, and that these two corporations established a direct working relationship under the Agency Agreement.
Throughout this opinion, where the term "plaintiff" is used in conjunction with the parties' Agency Agreement is should be understood in this context.

2. The Agency Agreement (PE1) provides in part:
"I. APPOINTMENT AND AUTHORITY
Underwriters (plaintiff) appoint the General Agency (defendant) as representative in California for purposes of marketing:
Fire and Allied Lines
Special Multi-Peril Policies
on behalf of The Central National Insurance Company of Omaha . . . This appointment also extends to the General Agent authority to appoint and remove agents, accept and decline risks, and collect premiums."

3. What this means is that the defendant was not to obligate the plaintiff on any insurance

policy covering a single risk insured for more than $1 million, unless contemporaneous with the issuance of such a policy the defendant procured a reinsurance policy to assume that portion of any loss sustained which exceeded $1 million. Therefore, on any single risk Central National's exposure would not exceed the first $1 million. Since the reinsurer was not obligated to pay any of the loss up to $1 million, this type of reinsurance is commonly known as "excess of loss" reinsurance.

4. A blanket insurance policy may be defined as a single policy of insurance covering several separate risks (in this case residential and commercial structures) in such a manner that each individual structure is protected to the full face value of the policy, which is often the estimated aggregate value of all of the covered property. See *Reliance Insurance Co. v. Orleans Parish School Bd.*, 322 F.2d 803 (5th Cir. 1963), *cert. denied*, 377 U.S. 916, 84 S.Ct. 1180, 12 L.Ed.2d 186 (1964).

ing purposes which exceeded the $500,000 limitation on Devonshire's authority. The Clubhouse was valued at $700,000 for building, $150,000 for contents, $150,000 for gross earnings, and $100,000 for rents, totalling $1.1 million.

It is undisputed that the defendant did not procure *pro rata*[5] reinsurance on the risk in excess of $500,000 covered under the above-mentioned policy.

On October 27, 1973, the Drexelbrook Clubhouse was heavily damaged by fire. Initial estimates made by a representative of Devonshire placed the loss of buildings, contents, rents, and earnings at approximately $1,000,000. On November 16, 1973, the plaintiff notified the defendant of the absence of the required reinsurance and submitted its claim under the indemnity clause of the addendum to the parties' Agency Agreement.

When policy SMP 59 83 77 was originally issued it included a special endorsement known as an average clause (stipulated amount).[6] The endorsement of the average clause (stipulated amount) had the effect of waiving the policy's coinsurance clause.[7] However, the policy also contained a replacement cost endorsement which entitled the insured to recover its replacement cost, rather than the actual cash value of the insured property in the event of any loss, and this replacement cost endorsement contained its own coinsurance clause. In the initial phase of adjusting the loss involved in this case the plaintiff proceeded under the assumption that a coinsurance clause would apply to any claim filed under the policy's replacement cost endorsement. Consequently, a local appraiser was hired to determine the replacement value of the Drexelbrook Complex. The appraiser found that the Complex had a total replacement value of $19,267,735 and that the Clubhouse had a replacement value of $1,188,867. Of course, since the Clubhouse was covered under a blanket policy, Central National was exposed for the entire $1,188,867 in addition to its exposures for contents, rents and lost earnings, unless a coinsurance penalty was applicable. When it was subsequently learned that the average clause (stipulated amount) endorsement had also waived the coinsurance clause of the replacement cost endorsement, the parties realized for the first time that Central National was not only exposed to a single risk of approximately $1.6 million which was not reinsured, but also that it was exposed for the entire $1.6 million, without coinsurance penalty, even though the risk had been undervalued at the time the policy was underwritten by about one-third ($\frac{1}{3}$).

The loss was finally adjusted by the parties, and a settlement was reached with the insured and paid by Central National in the amount of $778,782 for repair to the building, $160,000 for the repair and replacement of contents, and $160,000 for lost earnings and rents. An additional $144,385.00 is due pursuant to the settlement under the poli-

---

**5.** *Pro rata* reinsurance is a type of reinsurance where the reinsurer assumes a proportionate share of any loss sustained on the insured property from the first dollar of loss. *See infra* at 21.

**6.** The average clause (stipulated amount) endorsement (PE7) provides in pertinent part:

"1. IT IS EXPRESSLY STIPULATED AND MADE A CONDITION OF THIS POLICY THAT, IN EVENT OF LOSS, THIS COMPANY SHALL BE LIABLE FOR NO GREATER PROPORTION THEREOF THAN THE AMOUNT HEREBY INSURED ($26,284,447) BEARS TO THE STIPULATED SUM OF $26,284,447 . . . ."

The $26,284,447 figure represents the $9,190,000 value assigned to the buildings at the Drexelbrook location as well as the value of the

buildings at the other four (4) locations covered under SMP 59 83 77.

**7.** The coinsurance clause has been described as follows:

"The effect of the coinsurance clause is to reduce the liability of an insurer in terms of the percentage of coverage which the clause requires the insured to maintain. That is to say, coinsurance clauses in substance require the insured to maintain insurance on the property covered by the policy in a certain amount, and stipulate that upon his failure to do so, the insured shall be a coinsurer and bear his proportionate part of the loss on the deficit."

*Couch on Insurance·2d* § 62:124.

cy's replacement cost endorsement for a total settlement figure of $1,243,167. In addition, Central National incurred $31,759.56 in expenses associated with the adjustment of the loss as well as a disputed sum of $1,242.83 billed to the plaintiff by the defendant, for a total loss to Central National of $1,276,169.39.

## II.

The evidence in this case has left no doubt as to the following facts:

(i) Under the December 1, 1972 addendum to the parties' Agency Agreement, Devonshire was obligated to procure *pro rata* reinsurance on any risk in excess of $500,000, total sum insured;[8]

(ii) Policy number SMP 59 83 77, in dispute in this case, insured a single risk in excess of $500,000;

(iii) Devonshire did not procure *pro rata* reinsurance to cover all or any portion of the risk covered under the above-mentioned policy.

Nevertheless, Devonshire denies that it is liable to the plaintiff under the circumstances of this case.

## A.

The evidence has shown that during the month of December, 1972 (the first month the parties functioned under the December 1st addendum to their Agency Agreement, and the month the policy in question was written) there was a push on to write as much business as possible for Central National before the end of the year 1972. As a consequence a large amount of paper work was generated between the parties which was not processed with the customary speed and diligence. As noted above, the policy in question was written on December 19, 1972. The plaintiff received its first evidence of the issuance of the policy on January 25, 1973. As a result of the information received by the plaintiff, a letter, dated February 6, 1973, was written by the plaintiff's assistant underwriting manager to the defendant's underwriting manager which stated:

"We have now received the report on the Clubhouse, which is location # 1 on the policy, and note that the report indicates that it is valued at $850,000 and is 100% exposed.

"Since this policy is effective on December 31, 1972, it is my understanding that the maximum limit on any one risk written by your office would be $500,000.

"*I would appreciate your review of this and letting us have your advice and any necessary Reinsurance Certificate as soon as possible.*" (Emphasis added). (PE8). The plaintiff received no response to this letter and the matter of reinsurance did not arise again until after the loss occurred.

Devonshire contends that Central National is barred from indemnity in this case because after January 25, 1973, Central National knew that it was exposed to a risk in excess of $500,000 for which no collectable reinsurance had been acquired, yet it failed to take reasonable steps to see to it that the necessary reinsurance was obtained; that the plaintiff's failure to either procure the necessary reinsurance for itself or order the defendant to do so constituted an acquiescence in, or ratification of, the absence of reinsurance on this policy.

■ The contention that Central National should have procured the necessary reinsurance for itself is wholly repudiated by the evidence. Though it is clear that Central National attempted to oversee the underwriting of policies issued by Devonshire, Devonshire was principally responsible for underwriting, and made most, if not all, of the significant underwriting judgments.[9]

---

**8.** In a letter dated December 6, 1972, the defendant's president wrote to the plaintiff's president as follows:

"Just to confirm that we agree that facultative reinsurance should be arranged in Devonshire, Los Angeles and that all the billing, etc. should be handled by us." (PE6).

**9.** *See infra* at pp. 22–23.

Therefore, even though Central National had been credited for the full premium on the Drexelbrook policy, including that portion of the premium which should have been used to procure reinsurance, it is clear that Central National could not have procured the necessary reinsurance because it could not have made the determination of whether or not reinsurance was necessary without obtaining the advice of Devonshire and its underwriters.[10] Consequently, the letter of February 6, 1973 was a reasonable response to the situation and the only question which arises with reference to Central National's conduct until the time of the loss is whether or not it was obliged to follow-up its February 6th inquiry with additional efforts to secure a response from the defendant.

The defendant has referred the Court to the case of *Missouri Pacific Railroad Co. v. Arkansas Oak Flooring Co.,* 434 F.2d 575 (8th Cir. 1970). In that case the parties entered into a spur track agreement in July of 1950 which, *inter alia,* required the defendant to maintain a specified clearance between the plaintiff's track and the defendant's loading dock. The agreement specifically provided that if the plaintiff railroad was held liable for any damages arising by reason of improper clearance between the track and dock, the defendant would indemnify the plaintiff and hold it harmless. *Id.* at 577. On May 20, 1960, the plaintiff wrote the defendant to inform it that a loading dock roof was being maintained in violation of the said agreement. The letter demanded that the violation be corrected. On May 27, 1960, the defendant responded, pointing out that the violation had existed in substantially the same condition for the entire 10 years of the parties' relationship. Therefore, the defendant refused to take the structure down. No further action was taken by either party.

Subsequently, an employee of the plaintiff was injured as a result of the improper clearance and the plaintiff was required to pay its employee's claim. Plaintiff thereafter filed suit claiming indemnity from the defendant. As part of its defense the defendant offered to prove that the plaintiff had acquiesced in the clearance violation and in that regard attempted to offer the above-mentioned letters into evidence. The offer of proof was rejected by the trial court and an appeal was taken from judgment entered on behalf of the plaintiff.

On appeal the court said:

"The defense of acquiescence . . . rests for its vitality on *misconduct by the party seeking indemnification.*

"The generally recognized rule is that an indemnity agreement should not be construed to permit the indemnitee to recover for its own negligence 'unless the court is firmly convinced that such an interpretation reflects the intention of the parties.'

. . . . .

"We therefore hold that acquiescence, if established by the evidence, will constitute a defense to Missouri Pacific's claim for full indemnity." (Emphasis added). *Id.* at 579. The case was, therefore, remanded to the trial court for further proceedings.

There is, to be sure, a certain degree of factual similarity between the *Missouri Pacific* case and the present one. However, since the *Missouri Pacific* court did not enter a finding of acquiescence on the basis of the evidence before it, that factual similarity means little more than that this Court must consider the specific circumstances of this case and determine whether the evidence supports the defendant's theory of acquiescence or the plaintiff's theory of breach of contract. In an effort to make that determination the Court finds some additional guidance in the case of *Pennsylvania Railroad Co. v. Erie Avenue Warehouse Co.,* 302 F.2d 843 (3rd Cir. 1962). In that case the Court, in endeavoring to

---

**10.** On every occasion, when Central National had a question regarding the need for reinsurance it was addressed to Devonshire. On many, if not most, such occasions Devonshire was able to justify the absence of reinsurance despite the fact that reinsurance was indicated by the facts available to Central National. (DE 80; 81; 79; 52D).

define the principle of acquiescence, observed:

> "(i)t remains to consider what in general constitutes indemnity-defeating acquiescence by the indemnitee in the indemnitor's wrong, and whether the present record establishes such acquiescence. Basically, we think the concept covers comprehensively a variety of situations in which courts think that a party should be denied indemnity because his own conduct has been so blameworthy and has so *contributed to the harm in question that full restitution is inequitable or cannot properly be viewed as within the intended coverage of an agreement to indemnify.*
>
> "One hallmark of such acquiescence is long continued awareness of a dangerous situation by the indemnitee without either taking any corrective measure or *calling upon the indemnitor to do so.*" (Emphasis added).

*Id.* at 848.

Initially it should be noted that the only explanation for Devonshire's failure to procure the necessary reinsurance in the first instance is simple oversight, and though the Court has no reason to doubt that the volume of business written by Devonshire during the month of December, 1972 contributed to this lapse,[11] there has been no suggestion that these circumstances relieved the defendant of the contractual limitation upon its authority.

Similarly the most logical explanation for Devonshire's failure to procure the necessary reinsurance after receiving the February 6, 1972 letter is also simple oversight.[12] On this occasion, however, there is no reason to presume that the pressures and exigencies of the December rush had anything

to do with the defendant's failure to procure the necessary reinsurance.

Nevertheless, the defendant contends that the plaintiff has acquiesced in these transgressions because after February 6th the plaintiff took no further action to see that the necessary reinsurance was obtained. The uncontroverted explanation for plaintiff's failure to issue a second letter was that there had been an oversight in its internal office procedures customarily used to follow up such inquiries.

In the Court's judgment the defendant's position as predicated upon the foregoing facts is intrinsically implausible. Indeed, the acceptance of its position would turn the issues in this lawsuit on their head. This lawsuit was tried upon the proper presumption that the issue of negligent acquiescence and/or ratification would turn upon the following question: At what point is the defendant's duty to perform its contractual obligation overcome by the plaintiff's failure to demand·a proper performance? However, acceptance of the defendant's position would have the effect of shifting the defendant's duty to perform its contractual obligation to procure the necessary reinsurance to the plaintiff simply because the plaintiff failed to remind the defendant of said obligation more than one time. This extraordinary step would be taken not because Central National had failed to follow its customary practice of overseeing Devonshire's underwriting, but because an internal procedure of Central National's office had gone awry, and a follow-up on such oversight activities was overlooked.

█ The defendant is correct in pointing out that under Nebraska law, like the

---

11. In a letter dated November 28, 1973, from the defendant's Vice President to the defendant's errors and omissions carrier, the defendant described the oversight as follows:

> "In the month of December, 1972, there was a drive on to place as much business with Central National as possible, and inadvertently, the policy in question was written in Central National without recognizing the need to place it elsewhere because of the then most recent change in capacity."

(PE31, attach.).

12. The letter referred to, *supra* note 11, also provides:

> "We did receive a letter, dated February 6, 1973, from the Underwriting Manager of Central National, calling our attention to the possible exposure over $500,000, as per copy enclosed, and for no known reason, it was not acted upon nor was there any follow up to it."

(PE31, attach.).

Arkansas law involved in *Missouri Pacific,* a promise of indemnity is not ordinarily construed to permit an indemnitee to recover from his indemnitor for the indemnitee's own negligence unless it clearly and unequivocally appears that such was the parties intention, *Linden v. Chicago, B. & Q. R. R.,* 483 F.2d 29 (8th Cir. 1973), *cert. denied,* 414 U.S. 1159, 94 S.Ct. 917, 39 L.Ed. 111 (1974); *Ocean Accident & Guarantee Corp. v. Jansen,* 203 F.2d 682 (8th Cir. 1953); *Omaha Public Power Dist. v. Natkin & Co.,* 193 Neb. 518, 227 N.W.2d 864 (1975); *Peter Kiewit Sons Co. v. O'Keefe Elevator Co., Inc.,* 191 Neb. 50, 213 N.W.2d 731 (1974), and that the Agency Agreement in this case does not expressly entitle Central National to recover for its own negligence. However, Nebraska law does permit a promisee to recover for breach of contract when his promisor fails to fulfill his contractual obligations unless, *inter alia,* the promisee knowingly waives the promisor's breach, *Randall v. Erdman,* 194 Neb. 390, 231 N.W.2d 689 (1975); *McLeod v. Crawford,* 176 Neb. 513, 126 N.W.2d 663 (1964) and that has not been the case here. Nebraska law also permits a principal to recover from his agent for damages sustained as a result of the agent exceeding his authority, unless the principal has ratified the agent's act, which, likewise, has not been shown in this case.

■ In light of the above, the Court holds that the plaintiff is not barred from indemnity in this case by either negligent acquiescence in or ratification of the defendant's failure to procure *pro rata* reinsurance on the Drexelbrook policy for sums insured in excess of $500,000, any one risk.

**B.**

The defendant also contends that it is not liable to the plaintiff under the indemnity provision of the Agency Agreement, because, in paying the insured for its loss, the plaintiff waived a sustainable defense to its own liability under policy SMP 59 83 77. In this regard, the defendant contends that since it did not consent to the settlement reached between Central National and its insured, the burden is upon Central National to establish its own liability to its insured before it may recover under the indemnity provisions of the parties' agreement. Since in the defendant's view the evidence does not establish Central National's liability to its insured, the defendant contends that it is not liable to the plaintiff under the circumstances of this case.

■ The defendant contends that the plaintiff was not liable to its insured for the loss sustained on the insured property because in a letter dated October 20, 1972, from the insured's insurance broker to Devonshire, the value of the Drexelbrook Apartment Complex (which was subsequently used without verification to underwrite the policy in dispute) was understated by approximately 50%. (PE34). Therefore, the defendant contends that the insured may have been guilty of fraud and misrepresentation which would have permitted the plaintiff to avoid the policy under the policy's fraud provisions and Pennsylvania law.[13] *Bird v. Penn Central Company,* 334 F.Supp. 255 (E.D.Pa.1971).

13. In regard to the defense of fraud and misrepresentation on the part of the insured or its broker, the evidence shows that on October 20, 1972, an insurance broker representing the insured wrote to Devonshire to obtain information concerning the premium required for a policy of insurance to cover the Drexelbrook Apartments. The letter provided:

I would appreciate your submitting a quotation per the attached.

The above development (the Drexelbrook Apartments) was constructed in 1948 and consists of 1223 apartment units and 5,410 rooms. Our records also indicate that this apartment development consists of 90 two-story brick apartment buildings located on 137 acres of land, together with a shopping center, swimming pool and club.

If you have any questions, please feel free to call upon me."

(PE34). The attached memorandum provided in pertinent part as follows:

The plaintiff disputes the defendant's contention, claiming that the insured never made any representations as to value, but merely solicited a quotation from the defendant, see *Reliance Insurance Co. v. Orleans School District*, 322 F.2d 803 (5th Cir. 1963), *cert. denied,* 377 U.S. 916, 84 S.Ct. 1180, 12 L.Ed.2d 186 (1964), and further contends that whether the insured represented values or not, it was not guilty of misrepresentation since Devonshire inspected the property and expressly stipulated as to its value, knowing or having reason to know that the property was undervalued.

"SECTION I—Physical Damage covering all Risk on Replacement Cost Basis, including Agreed Amount on Blanket Basis.

| | | | |
|---|---|---|---|
| Apartments and their contents | $ 8,250,000 | 90% | Coinsurance |
| Shopping Center | 250,000.00 | 90% | Coinsurance |
| Club Building and Contents | 850,000.00 | 90% | Coinsurance |
| Apartments—Rents | 1,140,000 | 60% | Coinsurance |
| Shopping Center—Rents | 40,000.00 | 100% | Coinsurance |
| Club—Business Interruption—Rents | 150,000.00 | 50% | Coinsurance |

. . . ."

(PE34, attach.). The values contained on the attached memorandum were obtained by the broker from its latest past insurance policy. (DE41–18a). There is no evidence regarding the date or circumstance under which the requested premium quotation was communicated to the insured, but some type of understanding was obviously reached between the defendant and the insured because on or before December 4, 1972, Devonshire arranged to have the Drexelbrook Apartments inspected by an engineer. The engineer's inspection report for the Drexelbrook Clubhouse was prepared on one of the defendant's printed forms. (PE10). Typed in the upper left hand corner of the first page is the figure "$850,000", which of course corresponds with the figure for the Clubhouse building and contents given by the insured's broker in the letter of October 20th. The report itself indicates that a rather detailed inspection of the premises and its surroundings was made. Included in the report is a diagram of the structure containing its dimensions.

There is no question that the purpose for making the inspection was to ascertain the condition of the premises, the hazards to which it was exposed, and the existence and proximity of safety devices and fire protection. It is also clear that no effort was made, either by the engineer or the parties' underwriters, to estimate the value of the Clubhouse either from the inspection or the report based thereon. However, there is testimony that an estimate of the properties' value could have been made from the information contained in the inspection report.

On December 14, 1972, a binder was executed between the insured's broker and Devonshire. (DE77A). The binder purports to bind Central National to insurance coverage on the Drexelbrook Apartments in the amounts shown on the October 20th letter, however, the coinsurance requirement on the "Apartments", "Shopping Center", "Clubhouse" and their contents has been deleted.

As noted above, policy SMP 59 83 77 issued on December 19, 1972, bearing an effective date of December 31, 1972. Under the policy the buildings comprising the Drexelbrook Apartment Complex are insured on a blanket basis in the total amount of $9,190,000 and the contents are insured in a total amount of $160,000. It is undisputed that these values were derived from the values submitted by the insured's broker in its October 20th letter for "Apartments," "Shopping Center," "Clubhouse" and their contents.

After the Clubhouse fire it was learned that the value submitted by the insured for the Clubhouse structure was significantly lower than its total insurable value. However, because of the blanket feature of the policy the property was covered to its full insurable value, less any coinsurance penalty that might be applicable. However, since the policy's coinsurance clause had been waived by the average clause (stipulated amount) endorsement, no coinsurance penalty could be recovered despite the fact that the Drexelbrook Apartment Complex had been undervalued by the insured's broker by approximately 50%.

There is no dispute that the undervaluations noted above were the result of the fact that the policy was underwritten on the basis of the unverified values supplied by the insured in its broker's letter of October 20th. In light of these facts, the defendant contends that the plaintiff was not liable to its insured under the following provision of policy SMP 59 83 77:

"Concealment, fraud. The entire policy shall be void if, whether before or after a loss, the insured had wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto."

See also *Bird v. Penn Central Company,* 334 F.Supp. 255 (E.D.Pa.1971). There can, of course, be no question that the value of the insured property was a highly "material fact or circumstance" in light of the fact that the policy provided blanket coverage, with an average clause (stipulated amount) endorsement.

*See Home Insurance Co. of N. Y. v. Crowder,* 164 Ky. 792, 176 S.W. 344 (1915); Couch on Insurance 2d §§ 26:162; 37:687.

More importantly, however, the plaintiff claims that the defendant participated in and approved the settlement finally reached with the insured, and that the defendant has therefore waived this defense to its liability.

When the loss occurred, Devonshire sent a "property claims supervisor" to the scene. He met with a local adjuster hired by Devonshire to coordinate the investigation, salvage and adjustment of the loss and was taken to the site of the loss for a first hand inspection. Upon returning to his California office he filed a report to Central National dated November 5, 1973, roughly outlining the coverage and the magnitude of the loss.

On November 9, 1973, said local adjuster filed the first of a series of seven reports with Devonshire regarding the status of the loss.[14] Each of these reports was subsequently forwarded by Devonshire to Central National. On November 16, 1973, Central National wrote Devonshire advising it of the absence of reinsurance and putting it on notice of Central National's claim under the indemnity provision of the Agency Agreement. When no immediate response was received a second letter was written on December 5, 1973, to the same effect. It concluded as follows:

"Would you please acknowledge this situation, as I requested in my November 16 letter. Also we would like to know the name of your errors and omissions carrier, and believe that they should be given the opportunity to participate in the total

overall investigation and settlement of the loss."
(P16).[15]

On December 10, 1973, the defendant responded as follows:

"This is to acknowledge receipt of your letters dated November 16, and December 5, 1973. . . .

As per copy of our letter dated November 28, 1973, attached, you will note that International Surplus Lines Insurance Company, which is the errors and omissions carrier, has been put on notice.

We are working directly with their West Coast Representative as respects their involvement, and they will be getting in touch with us regarding their interest in the overall investigation and the settlement of the loss.

We will keep you informed of any developments."

(PE31).

In mid-December 1973 Central National initiated direct communications with the said local adjustor by requesting a complete appraisal of the Drexelbrook Apartment Complex. Despite these direct communications the said local adjustor continued filing his reports through Devonshire, and the Court is aware of no direct communication between Central National and the said local adjustor prior to the settlement which was not acknowledged in a letter provided to Devonshire.

The appraisal was concluded and submitted to Devonshire in the said local adjustor's "Seventh Report", dated February 11, 1974, and "reviewed completely" by Devonshire before it was forwarded to Central National. At that time Devonshire noted:

14. Only the "Eighth and Final Report" of the local adjuster was filed directly with the plaintiff on July 12, 1974. (PE12).

15. At trial there was an objection to any reference to the underlying errors and omissions insurance coverage in this case. However, this

case was tried to the Court without a jury, and the Court had been advised of the existence of the errors and omissions coverage since the first hearing in the case. The possibility that such reference would be prejudicial was therefore negligible. In this instance it was not.

"The (local) adjustor prefers to wait on loss of earnings and rents, but the possibility of policy limit on loss of earnings definitely presents itself and rents would be minor enough that I'm sure the adjustor could arrive at some acceptable figure for settlement purposes."

(PE20).[16]

When Central National received this report a letter was drafted to the said local adjustor stating Central National's position *vis a vis* the insured.[17] A copy of this letter was mailed to Devonshire along with a cover letter dated February 26, 1974, reading as follows:

"I am writing this letter prior to our telephone conversation which I anticipate we will have during the afternoon of February 25, 1974.

The enclosed letter to . . . (the local adjustor) is self explanatory.

I ask that you get in touch with your Reinsurer relative to the E. & O. loss, (sic) and ask them if they want to join us in the negotiations of this settlement. Please keep them fully informed of all of our negotiations. We refer to your carrier, International Surplus Lines Insurance Company, and Mr. Crippen's previous correspondence on this matter."

(PE21).

Though the appraisal had indicated that the Drexelbrook Apartment Complex had been substantially undervalued at the time the policy was written, neither of the parties suggested the possibility of raising a fraud defense.

On March 20, 1974, the vice president of claims for Central National traveled to Pennsylvania to view the loss and meet with representatives of the insured. A second adjustor was, at this time, hired by Central National to go over the loss and develop a recommendation.

In a letter dated March 26, 1974, Central National's claims vice president acknowledged a telephone call to Devonshire's claims vice president regarding the March 20th trip and the meetings with the insured. The letter provides in pertinent part:

"This will confirm our telephone conversation of March 25, 1974 in which I related to you my settlement negotiations of March 20, 1974 with Mr. William Austin of Helmsley-Speer and Irv Saperstein, the public adjustor.*

We met at . . . (the local adjustor's) office last Wednesday afternoon after I had reviewed the scene of the loss in the morning. We had retained Mr. John Sybrandt (the second adjustor) as consultant in the adjustment of this claim. . .

Mr. Sybrandt and myself went over . . . (the local adjustor's) property computations and agreed with him that the property loss was in the area of $950,-000. Our major question revolved around the coverage and the . . . (average clause) Endorsement. In meeting with Mr. Austin and Mr. Saperstein, Mr. Aus-

---

16. Plaintiff's Exhibit 20 was written by the property claims supervisor who had traveled to the scene of the loss just after it had occurred. In his prior report on the loss he said:
"LOSS OF EARNINGS:
. . . In speaking with the Club Management Personnel, we were told that earnings were in the area of $75–100,000 per month, which would reflect in $865,000 to $1,200,000 in earnings. If cost of goods and supplies were 50% of the earnings and 30% contribution clause was applied, it is possible a penalty would be applicable. . . . The possibility of policy limit or near that amount is very likely at first glance."

17. The letter, dated February 26, 1974, provides in part as follows:

"This will acknowledge your Seventh Report of February 11, 1974 to Devonshire and their transmittal letter. I also confirm our telephone conversation of Monday, February 25, 1974, on the future handling of this loss.
Upon reviewing your February 11, 1974, letter and attachments . . . we take the position that the insured grossly under-insured the property. Based upon . . . (the appraiser's) replacement cost evaluation of $19,267,735.00. We find that the insured should have carried 90% of this, or $17,340,-961.50."

* A public adjustor is, in fact, a private adjustor representing the interests of the insured for a fee.

tin first of all said that he had a conversation with your Russell McFarren (Devonshire's underwriting manager) on March 14 and, at that time, Russ told him that the Form 31 AVERAGE CLAUSE was in effect at the time of the Drexelbrook loss. . . .

In further discussing this loss, Mr. Austin said that he gave you, Devonshire, the values and premiums of the previous carrier and that he, William Austin, was a broker for Helmsley-Speer on this account. He also said that Devonshire inspected the property either shortly before or after the inception date of the contract. The engineer was an employee of Devonshire and came out of the New JERSEY area. You advised me that it is Devonshire's practice to engineer these units but that the engineer does not look to the values, just safety factors. *Based upon the values involved, that of the Helmsley-Speer values being half of the actual values, the only question I can see as to coverage would be an attempted fraud on the part of Helmsley-Speer.* It now appears, with the information described above, that the underwriting intent of Devonshire was to eliminate the co-insurance penalty through the AVERAGE CLAUSE Endorsement Form 31.

You were to discuss the full ramifications of this additional information with your underwriting Department. . . . Also, it is necessary that you relay this new information to your Errors and Omission carrier and again ask if they want to participate in the final settlement of this claim. *Time is of essence.* We believe that our total exposure has now been increased to at least $1,300,000 based upon the application of the AVERAGE CLAUSE Endorsement and the elimination of the co-insurance penalty. . . ." (Emphasis added).
(PE23).

Two days later the same parties had a second telephone conversation also acknowledged by a letter which stated:

"This will confirm our telephone conversation of March 28, 1974 in which I advised you of our continuing negotiations to settle this loss.

I am attaching a copy of John Sybrandt's letter of March 25, 1974, which is self-explanatory.

The information included in Mr. Sybrandt's report is compatible with that information I discussed with you on March 25 and confirmed by letter of March 26, 1974. Mr. Sybrandt confirms the application of the "Average Clause-Stipulated Amount" Endorsement Form 31. You confirmed with me on the phone that, in discussing the Form 31 Endorsement, Russ McFarren advised you that it was on the policy at the time of the loss.

Mr. Sapperstein (sic) (the public adjustor) called me today and, as a result of several conversations, we have arrived at a tentative settlement of the loss. This is based upon adjustment No. 2 as related on the fifth page of Mr. Sybrandt's report of March 25, 1974. We have approached the settlement of this loss, based upon our building repair estimate of $957,811 less depreciation of $177,598. The net building figure is $780,113. In addition to this, we have applied the contents of $160,000 on (sic) *a combination rent and gross earnings loss of $160,000, for a total* actual cash value figure of $1,100,113, Mr. Sapperstein (sic) advised me that he was of the opinion that his clients would accept this amount in settlement of the claim. We are subject to an additional claim for depreciation in the amount of $177,698 if the repairs of $957,811 are completed within a reasonable time.

*You agreed, with me, that this was the best possible loss settlement available to us, and we are going ahead on this basis.* . . .

*If you have any questions on this, please let me know.*" (Emphasis added).
(PE24).

There were no further communications between the parties regarding this settle-

ment. On June 14, 1974, proofs of loss were prepared by the insured reflecting the agreement discussed between the parties, and the appropriate sums were paid by Central National in late July 1974.

Under a contract of indemnity, both parties have a right to attempt to limit their potential liability by negotiating a settlement with the claimant. When the indemnitee enters into settlement negotiations he has an additional responsibility if he does not choose to forfeit his right of indemnity. That responsibility is, of course, to refrain from compromising any of the rights of his indemnitor.

Therefore, before an indemnitee can settle a claim he should attempt to obtain the prior approval of his indemnitor. The indemnitor can consent to the settlement, and thereby acknowledge the indemnitee's liability to the claimant. *See Porter v. Oklahoma Bacone Collete Trust*, 346 P.2d 328 (Sup.Ct.Okl.1959), *cert. denied*, 362 U.S. 927, 80 S.Ct. 754, 4 L.Ed.2d 746 (1960); *Schneider v. Schneider*, 284 Mo. 314, 224 S.W. 1 (1920); *Mason v. Cook*, 187 Ky. 260, 218 S.W. 740 (1919); 28 *Am.Jur.2d Estoppel and Waiver*, § 51, p. 662 (1966), or he can refuse to consent to the settlement thereby disputing either the indemnitee's liability to the claimant, or his own liability to the indemnitee. Of course, the indemnitor's refusal to approve the settlement does not preclude the indemnitee from limiting its own liability on the potential claim, *see Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir. 1973), *cert. denied*, 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974); *Missouri Pacific Railroad Co. v. Arkansas Oak Flooring Co., supra*, 434 F.2d at 580; *Tankrederiet Gefion A/S v. Hyman-Michaels Co.*, 406 F.2d 1039 (6th Cir. 1969); *Western Casualty & Surety Co. v. Southwestern Bell Tele. Co.*, 396 F.2d 351 (8th Cir. 1968), but it does put the indemnitee on notice that the indemnitor disputes some aspect of the settlement.

The initial responsibility of the indemnitor in these transactions is quite simple. He must respond in a reasonable and timely fashion to his indemnitee's settlement proposal, either by granting or withholding approval, or be bound by any reasonable settlement entered into in good faith. *Cf. Missouri Pacific Railroad Co. v. Arkansas Oak Flooring Co., supra*, 434 F.2d at 580.

In the present case it will be noted that at no time did Devonshire dispute its liability to Central National under the indemnity clause of the Agency Agreement, or Central National's liability to its insured under policy SMP 59 83 77, until this suit was filed. Indeed, the evidence establishes that Devonshire did not take any position with reference to its potential liability except one of either acquiescence or approval of all that was done, despite prompt notice of its potential liability and full knowledge of the course of negotiations and the imminency of settlement. Even when the defendant received the letter of March 28, 1974, stating "(y)ou agreed, with me that this was the best possible loss settlement available to us, and we are going ahead on this basis," Devonshire never interposed an objection or communicated a belief that the settlement failed to reflect a valid defense to the insured's claim.

Devonshire attempts to counteract the significance of this correspondence by pointing out that these communications were directed to its claims vice president, who was not privy to all of the circumstances surrounding the issuance of policy SMP 59 83 77 and the status of the adjustment of the Drexelbrook loss. However, the bulk of correspondence between Central National and Devonshire regarding this loss had been handled by Devonshire's claims vice president, and the letter of March 26, 1974, clearly states that settlement is imminent, that "(t)ime is of (the) essence", and that Devonshire is to discuss the matters surrounding the potential settlement and establish a position.

Devonshire also contends that its claims vice president was not privy to certain important information in the Sybrandt report at the time of the March 28, 1974, telephone conversation and could not therefore have

given knowledgable consent to the settlement. The Sybrandt report states in pertinent part:

> "In my opinion, the rents and gross earnings losses (sic) have been under-estimated by the adjustor. Those losses should be carefully analyzed and careful audit made of insured's income and expense statements. I believe it is most likely that insurance is woefully inadequate value for these two items."

(PE25). This statement of course suggests the possibility that a coinsurance penalty might be assessable against the insured. However, the evidence has shown that the rents and earnings losses were compromised by Central National and the insured, and no evidence was offered to substantiate the theory that this compromise was not a reasonable one. More importantly, the Sybrandt report was available to Devonshire within days of the March 28th conversation, and no objection was made to the rents and gross earnings compromise at any time prior to the filing of this lawsuit.

Accordingly, it has been established by a preponderance of the evidence that Devonshire is liable to Central National for breach of the December 1, 1972 addendum to the parties' Agency Agreement.

### III.

The measure of damages in this case is that amount which will compensate the plaintiff for the loss sustained as a result of the defendant's failure to provide collectable reinsurance on the risk in excess of $500,000 insured under the disputed policy. *Ranchland Auto, Inc. V. Cleveland*, 188 Neb. 804, 199 N.W.2d 702 (1972). In other words, the plaintiff is entitled to recover from the defendant that sum which would have been forthcoming from the reinsurer had the defendant fulfilled its contractual obligations.

The December 1, 1972 addendum to the parties' Agency Agreement specifies that Devonshire "will not write risks in excess of $500,000 total sum insured for any one risk

(irrespective of the PML) unless . . . the excess over the above-mentioned $500,000 limitation . . . (is) reinsured on a pro rata basis . . . ."

As noted, *supra* note 5, reinsurance on a *pro rata* basis refers to a type of reinsurance which assumes a fractional share of the reinsured risk. *Pro rata* reinsurance is distinguished from other types of reinsurance by the fact that the reinsurer is obligated to pay its appropriate proportion of any loss sustained on the property, from the first dollar of loss. For example, if the Clubhouse in the present case had incurred a $2,000 loss, the *pro rata* reinsurer would have been called upon to pay its proportionate share of the $2,000 loss.

In the present case the defendant (Devonshire) was obligated to procure *pro rata* reinsurance to assume the risk in excess of $500,000. In other words, the reinsurance policy was supposed to limit Central National's net retention to $500,000 on any one risk. This could ordinarily be accomplished by providing reinsurance coverage for that proportion of the risk which the total sum insured in excess of $500,000, bears to the total sum insured. Though this formula is usually a simple one to apply, there are conditions in the present case which have made it most difficult to calculate the appropriate percentages.

The first such condition is the fact that we are here dealing with a blanket insurance policy. A blanket insurance policy is a single policy of insurance covering several separate risks in such a fashion that each individual risk is protected to the full face value of the policy. *See Reliance Insurance Co. v. Orleans Parish School Bd., supra.* Nevertheless, the plaintiff argues that the "risk" which Devonshire was obligated to reinsure was the entire (multiple) risk assumed under the blanket insurance policy.

This argument need not detain us long. The term "risk" is a term of art in the insurance industry with a widely understood meaning which the parties obviously adopted and used in their relations under

the December 1st addendum to the Agency Agreement.[18] In the industry and between these parties the singular "risk" refers to that unit of property (be it one structure, less than one structure, or more than one structure) subject to a substantial risk of loss from the same, noncatastrophic, hazard. The evidence leaves no doubt that in applying this term as the parties did in their course of dealing, Devonshire was obligated to reinsure only those individual risks, such as the Clubhouse, covered under the policy with values in excess of $500,000.

Central National also argues that even if Devonshire was only obligated to reinsure the Clubhouse, the blanket nature of the coverage would have necessitated that reinsurance be obtained in the amount of the "total sum insured" on the Clubhouse irrespective of the PML", or probable maximum loss, which would be the full $10,780,000 in blanket coverage.[19]

First of all it should be noted that the phrase "probable maximum loss" is also a term of art with a specialized meaning adopted by the parties in their dealings with one another. The phrase simply refers to the fact that some portions of a particular structure or risk are so resistant to, or likely to be spared from damage in the event of a loss that special underwriting consideration is merited. The phrase has nothing to do with providing insurance coverage on a risk in an amount in excess of the risk's total insurable value.

More importantly, however, the plaintiff's theory, if accepted, would mean that Devonshire was required to purchase *pro rata* insurance coverage up to $10,780,000 without any prospect of ever recovering more than 95.4% of the risk's total insurable value. Since the reinsurer would be assuming an obligation which was virtually open-ended due to the lack of an applicable coinsurance penalty and the effective absence of any meaningful policy limitation, it seems unlikely that such coverage would have been available to the parties. In any event, the availability of such coverage was subject to proof and that proof has not been provided in this case.

Furthermore, even assuming the availability of coverage, it is obvious that if Devonshire was obligated to reinsure 95.4% of the $1.6 million at risk on the Drexelbrook Clubhouse, its authority would be limited far more severely than the $500,000 limitation provided in the Agency Agreement. Central National's net retention under such circumstance would be only about $73,000.

Nevertheless, the plaintiff argues that *only* by reinsuring the Clubhouse in one of the above-mentioned manners, is it possible to be *certain* that Central National's exposure on the Clubhouse will never be greater than $500,000.[20] This argument is based

---

18. Both before (DE61–N1; 61–01; 79–J, 79–I) and after (DE52D; 80–p; 80–D; 80–E; 81–D; 100–A) the December 1, 1972 addendum to the parties' Agency Agreement the parties, by their course of dealing, established a working definition for the term "risk" which is contrary to the notion that the multiple risk under a blanket policy was "one risk" under the addendum to the Agency Agreement.

19. Under either of these theories the "total sum insured" for the purposes of calculating the *pro rata* share of the reinsurer would be the $10,780,000 face value of the blanket coverage. Therefore, the reinsurer would bear that fractional share of any loss, which the total sum insured in excess of $500,000 ($10,780,000–$500,000 = $10,280,000) bears to the total sum insured, or $10,280,000/$10,780,000 or approximately 95.4% of the loss.

20. The plaintiff proffered a third theory of damages at trial which generally speaking would have based the reinsurer's *pro rata* share of the coverage on the value of the single risk with the highest declared value covered by the policy. Pursuant to this theory the plaintiff attempted to show that the policy covered a single risk at location number 2 with a declared value of $2,600,000.

The only testimony to substantiate this theory came from the defendant's former underwriting manager, and he repeatedly refused to state that the $2,600,000 structure was "one risk" under the parties' Agency Agreement. Rather he testified that the structure in question was a high rise and that it is customary to regard each two (2) or three (3) stories of a high rise as "one risk". If each two stories of this structure were considered a separate risk there is no way for the Court to determine whether or not the value of any such risk would exceed the value of the Drexelbrook Clubhouse.

upon the premise that under a blanket policy the insurer is exposed on each structure up to the full face value of the blanket coverage. Therefore, under such a policy the insurer assumes the risk that the value of an individual structure has appreciated since the policy was issued, or that it was undervalued for the purpose of underwriting the policy.

The plaintiff's argument is correct under the circumstances of this case. However, it is correct only because the parties waived the coinsurance clause of the policy covering the Drexelbrook Apartments. Had the policy's coinsurance clause been in effect Devonshire could have limited Central National's net exposure to a sum not significantly in excess of $500,000 simply by reinsuring the Drexelbrook Clubhouse for its estimated value at the time the policy was issued.[21] Given the course of dealings between the parties,[22] and the implausibility of reinsuring one risk in the face amount of the blanket policy, it seems to the Court that the only proper interpretation that can be placed on the parties' Agency Agreement is one which would require Devonshire to provide *pro rata* reinsurance on the estimated value of the Clubhouse at the time the policy issued. This finding serves to illuminate what in the Court's judgment is the ultimate issue in this case: Which of these parties was to bear the risk of waiving the policy's coinsurance clause?

It is the Court's judgment that in the agency relationship that existed between these parties, the ordinary risks associated with the waiver of the coinsurance clause would be borne by the principal, Central National, so long as the agent, Devon-

shire, had exercised ordinary care and had not violated its authority. However, an agent has a duty to his principal to act with the degree of care and skill customarily exercised by such agents, and to exercise any special skills that he may have on behalf of his principal. *Restatement, Agency 2d* § 379, p. 177. When an agent fails to live up to this standard of conduct he may be held liable to his principal for any damages caused thereby.

In the present case it has been shown that while Central National was marginally involved in overseeing the underwriting effort, Devonshire was the party primarily responsible for underwriting policies under the parties' Agency Agreement. Indeed, the parties' relationship was originally established, at least in part, upon Devonshire's representation that it possessed the experience and capacity to handle the primary underwriting responsibility. Furthermore, Devonshire possessed the authority to bind Central National and to issue policies of insurance obligating Central National to risks without Central National's prior approval, on the basis of underwriting judgments made by Devonshire's employees from facts and information developed by Devonshire's field agents. Consequently, while Central National endeavored to oversee Devonshire's underwriting, most, if not all, important underwriting judgments were made by Devonshire, including the determination of the proper unit of property constituting a single risk[23] and the determination of property values for underwriting purposes. This basic relationship was understood by the parties and was part of their agreement.[24]

---

21. Obviously this would not have assured that Central National was *never* exposed to a liability in excess of $500,000 on any single risk. However, it can reasonably be inferred that a coinsurance clause would have had the effect of shifting *most* or *all* of the risk of appreciation and undervaluation from the insurer to the insured.

22. *Supra* note 18.

23. *Supra* p. 21.

24. Portions of the deposition of the individual chiefly responsible for overseeing Devonshire's underwriting for Central National were read into evidence. Two of his statements, which are totally uncontroverted, should be noted here. In the course of a discussion as to how the term "per risk", or "risk" was defined by the parties, the witness was asked:

"Q. Well, you had no reason to doubt that the information furnished to you by Devonshire was not reliable?

There is no question that in underwriting policy SMP 59 83 77 the defendant utilized the property values submitted by the insured's broker in the letter of October 20, 1972 [25] without verification of any kind. There is evidence which indicates that the values in the October 20th letter were taken from the prior insurance policy on the property, but it is not known when or how those values were originally developed, or whether Devonshire was aware of the source of those values at the time of underwriting.

■ Ordinarily no significant question would arise between an insurer and an independent insurance agency as to the latter's negligence in establishing a value for insured property even though the agency had principal underwriting responsibility, since the coinsurance clause would protect the parties from errors of the type which have arisen in this case. However, since the coinsurance clause in policy SMP 59 83 77 was waived, the question squarely arises whether or not it is reasonable for an insurance agent with principal underwriting responsibilities to accept the insured's property valuation without verification under a blanket policy with an average clause (stipulated amount) endorsement.

The defendant contends that it is reasonable because the insured is a responsible and respected organization of high integrity, as is the insurance broker which represented the insured in these transactions.[26]

Certainly parties who have had successful and amicable dealings in the past will develop a high regard for the honesty and integrity of one another. In fact, most business transactions are based upon a greater or lesser degree of mutual trust. However, the wide use of the coinsurance clause in the insurance industry is the most pragmatic evidence of all that mutual trust

A. We relied very heavily on what Devonshire told us and that was the understanding and agreement between us."

In a later conversation regarding the question of how property values were determined in writing insurance policies the witness was asked:

"Q. Okay, and the acceptance or rejection of value reports was something that you left to Devonshire and you relied upon them to evaluate those reports of values, did you?
A. Devonshire had authority and we did rely upon them.
Q. Assess the worth of the value reports they got?
A. Yes, sir.
Q. And you didn't ask to look at their original valuation information, did you?
A. Not that I can recall, no sir.
Q. You didn't ask them in any of these (policies)?
A. No."

**25.** *Supra* note 13.

**26.** The defendant has offered defendant's Exhibit 80 into evidence to, *inter alia,* establish that the plaintiff also accepted the *unverified property valuations* of an insured. Defendant's Exhibit 80 refers to a different policy, and 80–P is a letter from Central National to Devonshire regarding the possible need for reinsurance on that policy. The letter provides:

"Although the captioned policy indicates that it does provide coverage on two buildings, it would appear that based on the amount exposed as indicated in the inspection report, our limit of liability is probably in excess of $500,000.

"We would appreciate your checking on this, and if this is correct, please arrange for pro rata insurance."

The face sheet of the policy indicates that two buildings were covered in the amount of $1,246,251. However, the engineering report (DE80–T), indicates that there are four separate structures insured under the policy and that their replacement value is substantially less than the amount insured on the policy. After an exchange of correspondence between the parties Devonshire wrote as follows:

"Today, I am sending a follow-up letter to the broker of the above risk for a statement of values on the buildings.

I shall be forwarding you a copy as soon as I receive it. In the meantime, we are going by what we have on the engineering report which indicates no need for reinsurance. You may be right about needing reinsurance on this risk and we shall know as soon as we get the statement of values."

(DE80–F). In due course the insured submitted a statement of values which generally substantiated the engineer's judgment as to the *re-placement* cost value of the structures involved.

It should be apparent that in this instance the plaintiff relied upon substantially more than the insured's unverified representation as to value.

is generally regarded as unacceptable for underwriting purposes. The Court does not feel that the waiver of the coinsurance clause, for reasons which are mutually advantageous to the parties,[27] means that an insurer is going to leave itself wholly at the disadvantage of the insured by accepting the insured's property valuation without any evidence supporting that valuation.

The evidence of value required by a reasonable person may take many forms. Certainly, the integrity of the insured, in the industry and in past dealings with the insurer, is some evidence that the insured would not attempt a deliberate fraud. However, regardless of the insured's integrity and good faith, there is always a degree of adversity between his interests and the insurer's. That adversity is especially intense under a blanket policy when the coinsurance clause is waived, because both of these factors tend to enhance the importance of proper valuations. Furthermore, even assuming that the insured would not be motivated by its own economic interest, it should be obvious that the insured's integrity provides little protection against the possibility that the insured has overlooked an element of value or erred in its computations.[28]

▮ The insurer's *only* protection against undervaluation, short of proving that the insured was guilty of a deliberate fraud, is the average clause (stipulated

amount) endorsement. That protection is almost entirely meaningless when the insurer accepts the unverified property valuations of the insured. In the present case, the plaintiff insurer had a right to assume that the defendant agent took reasonable steps to make an independent estimate of the properties' value before it stipulated to such value and bound the plaintiff to a risk for which no coinsurance clause was applicable.

▮ The Court does not mean to suggest that the defendant agent was required to value the insured property at its peril. As noted above, the ordinary risks associated with the waiver of a coinsurance clause are to be borne by the principal. Therefore, Central National assumed the risk of any valuation arrived at by its agent in a reasonable manner. However, the Court finds Devonshire's reliance upon the unverified values of the insured to be unreasonable under the circumstances of this case.[29]

Without hesitation, the Court further finds that if Devonshire had made a reasonable effort to verify the insured's property value, it would have discovered that the insured property was worth approximately $19,000,000 rather than $9,190,000 and that the Clubhouse building was worth approximately $1,188,867 rather than $700,000. The Court further finds that if the defendant had procured a *pro rata* reinsurance policy on the Clubhouse at the time of

27. The waiver of the coinsurance clause in lieu of the average clause (stipulated amount) is advantageous to both parties. From the insured's standpoint, he no longer has to be concerned about the prospect of a coinsurance penalty in the event of loss. Likewise, the insurer saves the expense associated with having all of the insured property appraised in the event of a loss.

28. It is worth noting that in early October 1972 several structures owned by the insured involved in this case were inspected by engineers on behalf of Devonshire. In the inspection reports filed in several of those cases the engineers included an estimate of the structures' replacement cost. In every case the replacement value estimated by the engineer was sub-

stantially greater than the value indicated on the first page of the report.

29. The Court has not overlooked the fact that the parties' Agency Agreement requires Devonshire to indemnify Central National if it "does not provide valid and collectable reinsurance in accordance with . . . (the Agency Agreement's) limitations." (PE1). However, the Court finds that the evidence has made it abundantly clear that the parties did not intend to shift the ordinary risk of waiver of the coinsurance clause to the defendant. The effect of such a construction of the parties' agreement would be to make Devonshire a reinsurer on every policy of insurance it wrote under the terms of the Agency Agreement.

underwriting the reinsurer's *pro rata* share would have been computed as follows:

| | |
|---|---|
| $1,188,867 | building |
| 160,000 | contents |
| 150,000 | gross earnings |
| 100,000 | rents [30] |
| $1,598,867 | |

$1,598,867–$500,000/$1,598,867 = 68.727855%

Therefore, the defendant is liable for 68.727855% of the sum paid by Central National for the loss sustained under policy SMP 59 83 77.

As noted above, *supra* part I., Central National paid the following amounts to the insured in settlement of its claim:

| | |
|---|---|
| $ 778,782.00 | actual cash value of building |
| 144,385.00 | replacement cost payment |
| 160,000.00 | contents |
| 160,000.00 | rents and gross earnings |
| $1,243,167.00 | total |

In addition, Central National incurred $31,759.56 in loss adjustment expenses, as well as a disputed sum of $1,242.83. The defendant contends that it is not liable for any portion of the plaintiff's loss adjustment expense. The evidence on this point is conflicting, however. In an affidavit referred to at trial a highly qualified and apparently impartial witness states:

"It is a standard practice in the reinsurance industry for adjustment expenses to be divided between the primary insurer and the reinsurer in the same ratio as the loss is divided."

(Affidavit of Kenneth John Cooper, Filing Number 64). Whether that "standard practice" is one based on express or implied terms of the reinsurance contract, it was apparently within the contemplation of the parties and should be a part of the plaintiff's recovery in this case. The disputed $1,242.83 which was paid by Central National as an expense associated with the loss of "10–27–73" on policy "SMP 59 83 77" (PE55) should also be included.

The defendant also contends that the plaintiff's recovery must be decreased in the amount which the reinsurance would have cost the plaintiff had it been properly provided by Devonshire. The plaintiff has acknowledged that such a reduction is in order.

 The defendant offered evidence at trial suggesting that if it had procured the required reinsurance, the reinsurer would have insisted upon assuming its *pro rata* share of the entire blanket policy. There is no evidence which contradicts that assertion. Consequently, it is held that the plaintiff's recovery be decreased by 68.727855% of the premium retained by Central National on policy SMP 59 83 77 which was $102,739.[31]

The foregoing shall constitute the Court's finding of facts and conclusions of law in

---

30. In the policy of insurance "rents" are insured on a blanket basis for $1,280,000. That figure was derived from the values provided by the insured in its letter of October 20, 1972, seeking a premium quotation. (PE34). In the October 20th letter, the insured requested a quotation based, *inter alia*, on the following values:

| | | | |
|---|---|---|---|
| Apartments—Rents | $1,140,000. | 60% | Coinsurance |
| Shopping Center—Rents | 40,000. | 100% | Coinsurance |
| Club—Business Interruption | 150,000. | 50% | Coinsurance |
| Rents | 100,000. | 100% | Coinsurance |

(PE34). The three figures for rents total $1,280,000 in blanket coverage. Therefore, the "total sums insured" on the Clubhouse includes a sum for rents, which in the absence of evidence to the contrary, is $100,000.

31. The defendant's contention that the plaintiff should not be entitled to pre-judgment interest is sustained. The proper manner of calculating the damages in this case was vigorously contested and the result ultimately reached by the Court does not entirely conform to any of the various theories propounded by the parties during the pendency of this action. *See Inland Drilling Company v. Davis Oil Company*, 183 Neb. 116, 158 N.W.2d 536 (1968).

accordance with Rule 52 of the Federal Rules of Civil Procedure.

Orders will be entered in conformity with the foregoing Memorandum.